THE STATE OF OHIO, APPELLEE, *v.* DIAR, APPELLANT.

[Cite as *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266.]

(No. 2005–2264—Submitted August 26, 2008—Decided December 10, 2008.)

O'CONNOR, J.

{¶ 1} On the morning of August 27, 2003, a fire seriously damaged the Lorain, Ohio home of defendant-appellant, Nicole Diar. The body of her four-year-old son, Jacob Diar, was found in the bedroom. Subsequent investigation determined that gasoline was used to start the fire and that Jacob had been killed before the fire began.

{¶ 2} Diar was convicted of the aggravated murder of Jacob and was sentenced to death. For the following reasons, we affirm Diar's convictions but reverse the death sentence and remand the cause for a new mitigation hearing.

### State's case

{¶ 3} Nicole Diar is a burn victim. At age four, Diar's pajamas caught fire, and she suffered horrific burns that left permanent scarring over much of her body. She underwent 61 operations over the next 14 years. As a result of the accident, Diar received a structured settlement that provided her approximately $3,000 per month and other periodic lump-sum payments.

{¶ 4} During the first few months of 2003, Diar and Jacob lived in an apartment on Beavercrest Street in Lorain. Rebecca Diar, the defendant's sister, and Taylor Diar, Rebecca's daughter, lived in the same building.

{¶ 5} On one occasion during 2003, 14–year–old Luis Agosto babysat for Jacob and Taylor. Diar and Rebecca asked Agosto to give Jacob some medicine because of his hyperactivity. The medicine was in a bottle that looked like it contained cough syrup, but Agosto did not read the label. After Diar and Rebecca left for the evening, two other teenagers, Christopher Shreves and Rachel Wise, came to the apartment. Agosto then gave Jacob a teaspoon of the medicine, and Jacob became sick and vomited. Shreves read the label and learned that the bottle contained Tylenol 3 with codeine that had been prescribed for Taylor. Shreves told Diar about the incident when she arrived home later that night. Diar said it was "no big deal" and that Jacob would be fine.

{¶ 6} During the summer of 2003, 15–year–old Destiny Faulkner babysat for Jacob. On three occasions, Diar asked Faulkner to give Taylor's codeine to

Jacob because it made him sleepy. Faulkner gave Jacob this medicine on two occasions. She did not give Jacob medicine on the third occasion because he was not sick.

{¶ 7} At trial, Sahar Sarkis, a pharmacist, testified that on May 20, 2003, he filled a prescription for acetaminophen with codeine, a schedule V drug, for Taylor Diar. Possible side effects in taking this drug include upset stomach, vomiting, nausea, and drowsiness.

{¶ 8} On July 1, 2003, Diar and Jacob moved into a rental home at 910 W. 10th Street in Lorain. Charles Hassler, the landlord, renovated the house before Diar moved in. He installed a new smoke detector near the dining room and made sure that all the smoke detectors in the house worked and had batteries.

{¶ 9} On the morning of August 26, 2003, Diar spoke to Michelle Gregory, Hassler's girlfriend. Diar said that she had lost her house keys and needed replacements. At 2:00 p.m. on August 26, Hassler went to Diar's house and gave her a replacement key. Diar told Hassler that someone had broken into her house the previous evening and had taken her keys and money orders that she had purchased to pay the rent. Diar said that she was going to change the locks to make sure that the house was safe.

{¶ 10} On August 26, Leroma Penn, Diar's next-door neighbor, saw Diar "off and on" for much of the day. Diar mentioned that she wanted to change the door locks because she suspected that John Walker, an acquaintance, had stolen her keys. Leroma volunteered to change the locks.

{¶ 11} Around 9:00 p.m. on August 26, Leroma installed a doorknob lock on the front door and a deadbolt lock on the back door. However, Leroma did not change the strike plate on the front door, which was sticking and making the door hard to open, because Diar said that she wanted to hear if anyone tried to enter the house. Leroma remembered handing the keys to Diar or putting them on the table after she installed the locks. Sometime that evening, Diar parked her car in an alley across the street from her house.

{¶ 12} Before Leroma left the house, Diar said that she was going to settle Jacob down for the night. Diar said that she would call Leroma later so they could get back together.

{¶ 13} Sometime later that evening, Leroma returned to Diar's home. Jacob was asleep on the living room couch. According to Leroma, Jacob slept mostly on the couch or chaise lounge in the living room. Leroma stated that Jacob did not spend much time in the first-floor bedroom, and she had never seen Jacob go into that bedroom by himself.

{¶ 14} Diar and Leroma spent the remainder of the evening sitting on the porch and drinking banana rum and Kahlua. At 1:00 a.m. on August 27, Leroma

went home. Before departing, Leroma saw Diar lie down on the couch with Jacob. He was wearing one of Diar's T-shirts. Leroma made sure the front door was locked when she left.

{¶ 15} At around 8:00 a.m. on August 27, Leroma called Diar because they had made plans to run some errands together that morning. However, Diar did not answer the phone. About an hour later, Leroma was in her basement when she heard Diar shrieking. Leroma went outside and saw Diar standing on her front porch while smoke was coming out the front door. Diar was screaming that her house was on fire, and she could not find Jacob. Leroma called 911.

{¶ 16} Edgar Penn, Leroma's husband, was awakened by Diar's screams. Edgar put on some clothes, went outside, and saw that Diar's house was on fire. Edgar asked Diar where Jacob was, and she said, "[H]e was in the front chair of the living room." She also said that Jacob could be upstairs or in the kitchen. Edgar could not enter the front door because of the smoke. Edgar then ran to the back of the house. However, he could not enter the house because the smoke was too intense.

{¶ 17} At 9:06 a.m., Lorain firemen were dispatched to Diar's house. Lieutenant Mark Nunez, one of the first firemen at the scene, observed heavy smoke and fire around the entire house. Nunez met Diar in the front of her house. Diar said, "[M]y baby's inside." Nunez and two firemen then entered the front door and saw that the fire was concentrated on the west side of the house where the first-floor bedroom was located.

{¶ 18} Fireman Steve Griffith arrived shortly after Nunez. Griffith talked to Diar in front of the house and asked where she had last seen her child. Diar said, "Downstairs in the back." As Griffith was about to enter the house, Diar pulled on Griffith's arm and told him, "[N]o, no, I mean he's upstairs. He's upstairs." Griffith then entered the house, walked through the heavy fire and smoke in the dining room area, and went upstairs looking for Jacob.

{¶ 19} Griffith thoroughly searched the second floor for Jacob. Griffith was trapped in the upstairs hallway and unable to return downstairs because the fire was coming up the stairwell. Despite the smoke, Griffith eventually found a window and jumped to the ground, injuring himself.

{¶ 20} Fireman John May talked to Diar outside her house during the fire. May noticed that Diar's skin and clothing were not covered in soot, and he did not smell any gasoline on her person. May testified that he would have expected Diar to have been covered in soot if she had spent any amount of time in her smoke-filled house.

{¶ 21} Around 10:00 a.m., the fire was extinguished. Lieutenant James Davis, a Lorain fireman, entered the house to look for hot spots and burning embers.

He smelled gasoline at the front door. Davis proceeded through the house and noticed an obvious burn pattern on the floor that went into the bedroom. Davis then entered the first-floor bedroom and found Jacob's severely burned body on the bed.

{¶ 22} Shortly after Jacob's body was found, Diar and her mother, Marilyn Diar, were escorted to a nearby ambulance. A paramedic examined Diar and determined that her lungs were clear, she had no problems breathing, and everything appeared normal. Diar was then informed that her son had been killed in the fire.

{¶ 23} Lorain Detective David Garcia, who was present in the ambulance, asked Diar what happened. Diar said she woke up to black smoke everywhere and tried to find her son, but was overcome by smoke and left the house. Diar provided no further information. However, she asked Garcia whether her son had been burned beyond recognition. Garcia replied that he did not know. Diar and her mother then left the area.

{¶ 24} Around 8:00 p.m. on August 27, Garcia spoke to Diar at her parents' home. In a taped interview, Diar stated that she was home on the night before the fire. Diar said that she had spent some time with Leroma, but she had had no other visitors that evening. Diar said that she had changed her door locks earlier in the day because she had lost her keys. Diar suspected that John Walker, who had been at her house on August 25, may have taken them.

{¶ 25} Diar told Garcia that Jacob had gone to sleep on the chaise lounge in the living room at about 11:00 p.m., and she went to sleep on the living room couch at about 1:30 a.m. Diar said the house was locked. At 4:30 a.m., Jacob woke up, and Diar gave him some juice. Diar said that she woke up between 8:50 and 9:00 a.m. and saw black smoke everywhere. Diar saw that Jacob was not on the chaise lounge, and she called out for him but received no answer. Diar said she went into the dining room looking for Jacob but left the house because she could not breathe. She also went back into the house a second time to find Jacob but was unsuccessful. Diar said she did not know what caused the fire.

{¶ 26} Diar said she was wearing a beige top and denim skirt that morning. Diar was still wearing this clothing during the interview, and these clothes were not covered in soot.

{¶ 27} On August 27, Lee Bethune, a fire investigator with the Ohio Fire Marshal's Office, examined the house. Upon entering the front door, Bethune noticed a "[v]ery strong" smell of gasoline in the area of the living room couch and the rug in front of the couch. He stepped on the rug in front of the couch, and liquid oozed from it. Bethune also noticed that the living room area suffered less fire damage than the dining room.

{¶ 28} Bethune detected blistering coming up the table legs and chairs in the dining room and irregular burn patterns at floor level in that room. Such burn patterns showed that the fire had occurred at floor level and that an accelerant had been used to spread the fire from the dining room into the bedroom where Jacob's body was found.

{¶ 29} The bedroom was severely damaged by the fire. Bethune found irregular burn patterns and deep gouging on the floor near the foot and the side of the bed. These burn patterns were consistent with a flammable liquid having been poured around the bed.

{¶ 30} Bethune concluded that the "fire was started by the direct act of a human hand and flame device with an accelerant." He identified gasoline as the accelerant because samples collected from the living room carpet, the rug, and the seat cushion tested positive for the presence of gasoline. Bethune also concluded that the bedroom was the "targeted area with a trail being poured from the living room to the dining room and into the bedroom."

{¶ 31} Bethune stated that a quart of gasoline might have been sufficient to start and spread the fire. However, Bethune was unable to find a gasoline container or the remains of such a container in the house or the surrounding area.

{¶ 32} Bethune also examined the downstairs bathroom. He testified that the bathtub was about three-quarters full of water and that children's toys were in the bathtub. Bethune stated that none of the water in the bathtub came from fire hoses.

{¶ 33} On August 29, Genevieve Bures, a fire investigator hired by the landlord's insurance company, conducted an investigation into the cause of the fire. Bures's observations and findings were essentially the same as Bethune's. Bures concluded that the "fire was set; it was not accidental."

{¶ 34} On August 29, Ralph Dolence, an electrical expert, examined the wiring, the appliances, the hot water tank, and the furnace at the house. He found that the wiring system in the house had been updated and was "fairly new." Dolence determined that there was no electrical failure or malfunction that might have caused or contributed to the fire.

{¶ 35} Dr. Paul Matus, the Lorain County Coroner, conducted the autopsy on Jacob. Dr. Matus stated that Jacob's manner of dress was "very peculiar and somewhat alarming." Despite the warm weather, Jacob was dressed in long pants, a T-shirt, and a hooded sweatshirt. The hood had been pulled down over his face.

{¶ 36} Dr. Matus determined that Jacob's cause of death was "homicidal violence * * * of an undetermined origin." In reaching this conclusion, Dr.

Matus found that Jacob did not die as a result of the fire. His mouth and nasal passages were clear of any soot, foam, or debris, and his larynx, trachea, and lungs were clear of soot and debris. Dr. Matus was unable to determine whether Jacob had died from a head injury, because there was "near total destruction * * * of the skull itself."

{¶ 37} Subsequently, Christa Rajendran, an examiner at the State Fire Marshal Forensic Lab, determined that the velvet hood and underwear worn by Jacob and the mattress pad tested positive for the presence of gasoline.

{¶ 38} On August 30, Jacob's funeral was held. On the day before the funeral, Chad Diar, the defendant's brother, drove a limousine through the drive-through lane at Junction Beverage. Chad ordered a 12–pack of Diet Pepsi. The clerk asked whether he needed anything else. Diar then stuck the top half of her body out the limousine window and said, "I want the liquor. Don't forget the liquor."

{¶ 39} In the evening after the funeral, Diar and her brothers and sisters went to Jack and Diane's Lounge. Witnesses saw Diar drinking, singing karaoke on the stage, and line dancing. On the same evening, Dustin Otero, an acquaintance of the defendant, saw Diar and others at a local bowling alley. Otero said that Diar was bowling, drinking, and having a good time.

{¶ 40} Shortly after the fire, Alicia Huff, a friend of the defendant, asked Diar about who might have started the fire. Diar mentioned several theories. She thought that "two crackheads" might have started the fire; she also surmised that Leroma might have put drugs into her drink on the night before the fire. Diar added that Walker and Nate Watkins, an acquaintance, might have been involved.

{¶ 41} During the week after Jacob's death, Huff told Diar that she wanted to hold a candlelight vigil and hand out flyers to help find the killer. However, Diar did not want to do this. Over the next two to three weeks, Huff tried to talk to Diar, but Diar refused to speak to her. Huff then sent a text message to Diar saying, "I know." Two minutes after receiving the text message, Diar contacted Huff and said she wanted to socialize with her.

{¶ 42} On September 3, 2003, Detective Garcia and Sergeant Albert Rivera conducted a videotaped interview of Diar. During the first part of the interview, Diar discussed events leading up to the fire. She said her house had been broken into about a week before the fire. Diar learned about that break-in after Jacob woke her up and she found the front door open and the desk drawers pulled out. Diar also stated that she had lost her keys two nights before the fire, and she suspected that Walker had stolen them.

{¶ 43} Because her keys were missing, Diar stated that she had changed her door locks on the night before the fire. Diar also made sure that her windows

were locked. According to Diar, the attic window in the front of the house and the window holding the air conditioner were the only windows that were not locked. She also parked her car across the street.

{¶ 44} Diar told the officers that she had given Jacob a bath on the night before the fire. She thought that he had been wearing underwear and one of her T-shirts. Diar went to sleep on the couch, and Jacob slept on the chaise lounge. At 4:30 a.m., Jacob woke up Diar and asked for some juice. Diar gave Jacob some juice, and he went back to sleep on the chaise lounge with his dog. Diar then went back to sleep on the couch.

{¶ 45} Between 8:50 and 9:00 a.m., Diar woke up and saw "black smoke everywhere." Diar screamed for Jacob, but he did not answer. She went outside and screamed for someone to call 911. Diar then went back inside the house to look for Jacob. She attempted to go into the dining room, but she was coughing and choking and was unable to advance any further. Subsequently, the fire department arrived. Diar remembers that "somebody yelled for the fire-fighters to check upstairs" for Jacob. However, she said that Jacob never went upstairs.

{¶ 46} Diar believed that the fire was accidental. She speculated that Jacob might have gone into the bedroom looking for his dog after waking up and finding that his dog was no longer in the living room. She also thought that Jacob might have gotten hold of her lighter and started the fire. But Diar said there was no gasoline in the house that Jacob might have used to start the fire.

{¶ 47} As the interview progressed, the investigators confronted Diar by telling her that scientific and medical evidence showed that Jacob did not die in the fire. Diar said, "[N]o way" and began sobbing. She also said, "I did not harm my son. He was my life."

{¶ 48} Diar insisted that she never smelled gasoline in the house before or during the fire. When informed that Jacob's body was found wearing a hooded sweatshirt, Diar stated that she was unaware of that. Diar said that Jacob was not wearing a hooded sweatshirt that evening, and she did not believe that Jacob even had one.

{¶ 49} Investigators suggested that Jacob might have died in an accident in the bathroom. Diar said this did not happen and denied starting the fire to cover up his death. Investigators also suggested that she might be trying to protect a boyfriend who had been at her house that evening and had accidentally killed Jacob. Diar also denied that this had occurred.

{¶ 50} During the investigation, police examined the front and rear attic windows as possible entry points into the house. However, these windows could not be reached without a ladder.

{¶ 51} Police recovered the new front doorknob and back door locks that were on the doors at the time of the fire. On October 2, 2003, Chad and Edward Diar, the defendant's father, gave police three keys, and they opened the front and back door locks. Investigators checked the hardware store where the locks were purchased and found that the locks were sold with four keys. Police suspected that Chad had removed one of the keys to suggest that a stranger had accessed the house the night of the fire.

### Defense case

{¶ 52} On August 27, 2003, Dennis Johnson, the senior chaplain for the Lorain Police Department, was with Diar in the ambulance during the fire. Johnson stated that Diar was sobbing and upset.

{¶ 53} Kelly Pitts, a registered nurse at Amherst Hospital, saw Diar in the emergency room after the fire. Diar's chief complaint was smoke inhalation, and she was treated with oxygen. Pitts noticed a faint odor of smoke on Diar's person and clothing. Diar had dry and cracked lips and was dehydrated.

{¶ 54} Marilyn Diar testified that Diar had been unsure that she could ever get pregnant because she had taken steroids during her burn treatments. Diar was thrilled when she learned that she was pregnant. Jacob was a healthy, happy baby, and Diar loved him.

{¶ 55} After learning about the fire, Marilyn went to Diar's house. Marilyn asked Diar where Jacob was, and Diar said, "I don't know." Diar was "upset" when told that Jacob had died in the fire. Marilyn then drove Diar to Marilyn's house, and Diar went to bed. Diar appeared to be in shock. At the urging of police officers, Marilyn later took her to the hospital to be examined for fire-related injuries. Marilyn said that Diar had soot under her nose but was not covered in soot.

{¶ 56} Marilyn testified that during the funeral, Diar was not screaming and crying, but she has never shown a lot of emotion and was on medication. On the evening after the funeral, Diar and other family members went to a bowling alley and some other places because Chad insisted that they leave the house to get their "mind off some of this stuff." A few days after the funeral, Diar talked with family members about conducting a vigil or handing out flyers. On the advice of counsel, the family decided not to do anything because Diar was being treated as a suspect.

{¶ 57} Edward Diar testified that following Diar's police interview on September 3, she told him that her house keys were in her purse. Edward took the three keys inside Diar's purse and later gave them to the police.

{¶ 58} Linda Powers, a medical social worker who runs "burn camps," testified that burn camps provide young burn survivors the opportunity to enjoy horse-

back riding, swimming, and other camp activities. Diar was a regular participant at burn camps until she was 18 or 19 years old. She also attended burn camps after Jacob was born. Powers testified that Diar and Jacob had a "very caring, very nurturing" mother-son relationship.

{¶ 59} Guy Morton, the pastor at Jacob's funeral, testified that Diar's behavior was typical of someone who had lost a loved one. During the funeral, Diar seemed like she was carrying the whole world on her shoulders. During counseling sessions after the funeral, Diar broke down and wept.

{¶ 60} Darrell Eberhardt, a family friend, and Nicksa Ortiz, who had lived with Diar on two separate occasions, testified that Diar had a warm, loving relationship with Jacob. Both of them observed Diar grieving and crying during the funeral service.

{¶ 61} Stacey Mihalic, who had once lived in the same apartment complex as Diar, testified that Diar and Jacob did things together, and Jacob always had new toys and clothes.

### Case history

{¶ 62} In April 2004, Diar was indicted on aggravated-murder and other charges. The court approved an amended indictment in September 2005. Count 6 charged Diar with the aggravated murder of Jacob with prior calculation and design. Count 7 charged Diar with the aggravated murder of Jacob, a child under the age of 13. Both counts contained a death-penalty specification for the murder of a child under 13 years of age, R.C. 2929.04(A)(9).

{¶ 63} Diar was charged with eight additional counts: Counts 1 and 10 charged Diar with complicity to corrupt another with drugs, Count 2 charged the felonious assault of Jacob, Count 3 charged murder, Counts 4 and 5 charged Diar with aggravated arson, Count 8 charged tampering with evidence, and Count 9 charged her with the felonious assault of fireman Griffith.

{¶ 64} Diar pleaded not guilty to all charges. The jury found Diar guilty of all charges, and she was sentenced to death. The cause is now before this court upon her appeal as of right.

### Pretrial and trial issues

{¶ 65} *Character and "other acts" evidence.* In proposition of law V, Diar argues that the trial court erred by admitting testimony that she was a bad mother, used babysitters excessively, improperly instructed babysitters to give Jacob codeine, went to a bar on the day of Jacob's funeral, and committed other misconduct. She also argues that the trial court erred by failing to provide the jury with limiting instructions on the admissibility of such evidence.

{¶ 66} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B). Such evidence may be admissible, however, for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. The admission of such evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62.

{¶ 67} In a motion in limine, the defense objected to the introduction of the following testimony: Diar was a poor housekeeper; she left her son with babysitters frequently; she gave cigarettes to babysitters; she went to bars with her girlfriends; she went to bars after her son's death; and she had trouble managing money.

{¶ 68} The prosecutor responded that the state's theory was that Diar killed Jacob because she no longer wanted a child, and taking care of Jacob was interfering with her style of life. The prosecutor argued that testimony showing that Diar did not properly care for Jacob, left him with babysitters, and went to bars before and after her son's death helped prove Diar's motive for killing Jacob.

{¶ 69} The trial court denied the motion in limine in part and granted it in part. The court permitted testimony on whether Diar gave cigarettes to babysitters, went to bars with girlfriends, and went to bars after Jacob's death. The trial court barred testimony regarding whether Diar was a good housekeeper; whether she let Jacob stray from his yard; whether she had babysitters stay with Jacob, but "only to the extent that the State makes no mention as to appropriateness"; whether she employed babysitters who had previously been found to be delinquent; and whether she had problems managing money.

{¶ 70} During the trial, except where mentioned, the defense did not renew its objections to the introduction of "other acts" testimony and thus waived all but plain error. See *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34 ("a ruling on a motion in limine may not be appealed and * * * objections * * * must be made during the trial to preserve evidentiary rulings for appellate review").

{¶ 71} **1. Lack of parenting, poor housekeeping, and money problems.** Leroma testified that Jacob often came by himself to her home when he wanted to play with her children. Leroma also said that Rebecca, the defendant's sister, was "always keeping" Jacob. Faulkner, a frequent babysitter, testified that Diar treated Jacob like a little brother, that he "seemed like a bother" to her, and that Diar was frequently on Internet chat rooms. Faulkner testified that on one occasion, when Jacob attempted to climb on his mother's lap, Diar said, "No,

Jacob, I'm trying to work on the computer." Wise, another babysitter, opined that Jacob was "a good kid around Becky, not so much * * * around Nicky." During cross-examination of Ortiz, the state elicited that Diar fed Jacob fast food "[m]ost of the time."

{¶ 72} Testimony that Diar left Jacob unattended, fed him fast food, and acted like Jacob was a bother provided the context for the alleged crimes and made Diar's actions more understandable to the jurors. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 76; see also *State v. Thompson* (Sept. 23, 1997), Franklin App. No. 96APA12–1660, 1997 WL 599178, *9 (defendant's lack of effort to properly bond with her daughter and her inability to cope with the pressures of single motherhood were part of the immediate background of the crime and admissible in proving defendant's motive and intent to kill her daughter). Other testimony, such as Diar's time on the computer and Wise's opinion that Jacob acted better around Rebecca, had marginal relevance in proving motive. This testimony did not result in plain error.

{¶ 73} The state also presented testimony that Diar left her yard in an unsafe condition. Leroma testified that she told Diar to remove broken glass from her lawn because Jacob might step on it in his bare feet, but Diar refused. Leroma's testimony had little relevance. However, no plain error occurred because of the minor significance of the testimony. See *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 48.

{¶ 74} The state also presented testimony that Diar left her house unclean. Huff testified on redirect examination, over defense objection, that Diar's house was "[n]ot very clean," and there were "clothes everywhere and dishes and food bags." Ortiz, a defense witness, acknowledged during cross-examination that Diar "didn't clean up after anything, she just left things laying everywhere." The defense opened the door to both witnesses' testimony. Huff's redirect testimony responded to cross-examination that Diar had been a good mother and had done a lot for Jacob. Ortiz's cross-examination was also proper because she testified on direct examination that Diar had been excited to be a mother and had had a good relationship with her son. See *Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 77–78.

{¶ 75} Finally, Diar challenges Huff's testimony on redirect that she irresponsibly gave money to male friends who came to visit her and that she would run out of money early in the month. Diar also claims that Huff improperly testified, over defense objection, that Diar's problems with her former landlord were a reason she moved to her new house.

{¶ 76} The defense opened the door to testimony about Diar's financial irresponsibility. Huff's redirect testimony was presented in response to cross-examination eliciting that Diar was a "good-hearted" person who gave money to

men who would come to her house. Testimony that Diar had unspecified problems with her landlord had no relevance and should not have been admitted. However, there was no prejudice because this testimony was brief, and no details about Diar's problems with her former landlord were elicited.

{¶ 77} **2. Frequent use of babysitters.** The state presented testimony that Diar went out on many occasions and left Jacob with different babysitters. Faulkner, who was 15 years old, would occasionally babysit for Jacob during the day. Faulkner testified that on a couple of occasions, Diar called Faulkner's school, pretended to be her mother, and obtained an excused absence so that Faulkner could babysit for Jacob. Evidence that Diar called Faulkner's school and pretended to be her mother showed the extreme lengths that Diar would go to get a babysitter and was admissible in proving motive under Evid.R. 404(B).

{¶ 78} Wise and Agosto, two other babysitters, testified that Diar did not leave emergency phone numbers for them to contact her if something happened to Jacob. Wise also testified that Diar would not arrive home until 3:00 or 4:00 a.m. Over defense objection, Agosto, who was 14 years old in 2003, testified that Diar paid him with cigarettes for babysitting Jacob.

{¶ 79} Testimony that Diar frequently used babysitters when she went out at night, failed to leave emergency contact numbers with them, and stayed out late tended to show that Diar was more interested in having a good time than in looking after Jacob. This testimony supported the state's theory that Diar killed Jacob because she was tired of being a mother and that taking care of Jacob was interfering with her style of life. This testimony was properly admitted to prove motive. Testimony that Diar paid Agosto in cigarettes had no relevance in proving motive and should not have been admitted. Nevertheless, this testimony was insignificant and not prejudicial.

{¶ 80} **3. Instructing babysitters to give Jacob codeine.** Faulkner testified that on three different occasions, Diar asked her to give Jacob codeine that was not prescribed for him. Agosto testified that Diar and Rebecca asked him to give Jacob this medicine because Jacob tended to get a little hyper. Shreves watched Jacob take the medicine and get sick and vomit. Shreves testified that after telling Diar what happened, Diar said it was no big deal.

{¶ 81} Testimony that Diar told her babysitters to give Jacob codeine and expressed little concern about his welfare after being told that he had been sick was evidence that Diar was unconcerned for Jacob's well-being and viewed him as a burden. This evidence was probative of Diar's motive for killing Jacob and was properly admitted. Moreover, Diar was charged with complicity to corrupt another with drugs in Counts 1 and 10. Thus, testimony that Diar had told the babysitters to give Jacob codeine was properly admitted to prove those separate offenses.

{¶ 82} **4. Reaction to Jacob's death.** Over defense objection, the state presented testimony that on the evening following Jacob's funeral, Diar was dancing, drinking, and singing karaoke at a bar. Samantha Garcia observed Diar at a bar that night having a "good old time." Joyce Harkless saw Diar singing at the bar and said that she did not appear to be upset or sad. Otero testified that on the same evening, he saw Diar "bowling, drinking, * * * [and] having a good old time."

{¶ 83} Carol Abfall, the clerk at Junction Beverage, testified that on the day before Jacob's funeral, Diar said, "I want the liquor. Don't forget the liquor" while traveling through the drive-through lane at the store.

{¶ 84} Finally, Huff testified, over defense objection, that "[m]ore than six months" passed after Jacob's funeral before a headstone was placed on his grave.

{¶ 85} Evid.R. 701, which governs opinion testimony by lay witnesses, provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 86} Opinion testimony about Diar's demeanor at a bar on the night following Jacob's funeral satisfied both requirements of Evid.R. 701. Several witnesses personally observed Diar's demeanor at either the bar or the bowling alley. Diar's lack of grief and exuberant behavior on the day of Jacob's funeral were relevant in proving motive under Evid.R. 404(B). See *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 125 (absence of grief after being notified of wife's death admissible against defendant as lay opinion). The trial court did not abuse its discretion in admitting this testimony.

{¶ 87} Testimony that Diar was dancing, drinking, and singing, and Abfall's observations involved factual matters. This testimony was also admissible to prove motive under Evid.R. 404(B).

{¶ 88} Testimony about the delay in erecting a gravestone appears to have little relevance. However, this testimony was insignificant and not prejudicial.

{¶ 89} **5. Mentioning Jacob's lack of supervision and Diar's behavior after the funeral during closing argument.** Diar complains that the prosecutor improperly stated during closing argument, "She did what she wanted to do. She didn't worry about the supervision." Diar also claims that the prosecutor improperly argued that on the evening following the funeral, "[s]he changed into tight-fitting clothes, she line danced and she sang karaoke." However, trial counsel failed to object to these arguments and waived all but plain error. *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 100.

{¶ 90} The prosecution is entitled to significant latitude in its closing remarks. The prosecutor may comment on "'what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 263 N.E.2d 773. Testimony about Jacob's lack of supervision and Diar's behavior after the funeral was properly before the court. The prosecutor's comments about this evidence did not result in plain error.

{¶ 91} **6. Limiting instructions.** Diar argues that the trial court erred by failing to provide the jury with limiting instructions on the admissibility of "other acts" evidence. However, the defense never requested limiting instructions and thus waived all but plain error. *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 620 N.E.2d 50. Nothing suggests that the jury used "other acts" evidence to convict Diar because she was a bad person. Accordingly, the trial court's failure to give limiting instructions did not constitute plain error. See *Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 162.

{¶ 92} Based on the foregoing, we overrule proposition V.

{¶ 93} *Motion to sever.* In proposition of law X, Diar contends that the trial court erred in denying her motion to sever Counts 1 and 10, the charges of complicity to corrupt another with drugs, from the rest of the charges.

{¶ 94} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293, quoting *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288.

{¶ 95} Nonetheless, "'[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses,'" a trial court may grant a severance. Crim.R. 14. The defendant, however, bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29, quoting *Torres* at syllabus.

{¶ 96} The state may rebut a defendant's claim of prejudicial joinder in two ways. First, if in separate trials the state could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder. *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. Second, the state can refute prejudice by showing that "evidence of each crime joined at trial is simple and direct." Id.

{¶ 97} The trial court did not abuse its discretion by rejecting Diar's motion to sever the charges. First, as discussed in proposition of law V, testimony that Diar instructed babysitters to give Jacob codeine that had not been prescribed for him showed that Diar was not concerned about Jacob's well-being and viewed him as interfering with her style of life. Thus, this testimony was admissible under Evid.R. 404(B) to help prove Diar's motive for killing Jacob.

{¶ 98} Second, the evidence proving Counts 1 and 10 was sufficiently simple and direct to negate Diar's claims of prejudicial joinder. The testimony of Faulkner, Agosto, Wise, Shreves, and pharmacist Sarkis established that Diar was guilty of complicity to corrupt another with drugs. Their testimony was separate and distinct from the evidence presented to prove the murder itself.

{¶ 99} Nevertheless, Diar argues that the jurors may have linked testimony about giving Jacob codeine to his cause of death. This argument, however, lacks merit because Dr. Matus testified that no prescribed or over-the-counter drugs were found in Jacob's body during the autopsy. We reject proposition X.

{¶ 100} *Gruesome photographs.* In proposition of law VIII, Diar argues that the trial court erred in admitting gruesome photographs during the trial.

{¶ 101} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph substantially outweighs the danger of unfair prejudice to the accused. *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267; see also *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 102} The prosecutor presented, without defense objection, state's exhibits 15–A through 15–V, crime-scene and autopsy photographs, during Dr. Matus's testimony. Subsequently, over defense objection, the trial court admitted these photographs into evidence except for state's exhibits 15–L, 15–N, and 15–R.

{¶ 103} Diar complains that these gruesome photographs were inflammatory and unduly prejudicial. State's exhibits 15–A, 15–B, and 15–C depict three different views of Jacob's charred body as it was found in the house. State's exhibit 15–D depicts Jacob's body on the mattress after the mattress had been removed to the coroner's office and showed that Jacob was lying face down. These photographs were relevant in illustrating the coroner's testimony, providing an overall perspective of the victim's injuries, and showing the position of Jacob's body on the mattress. See *Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 94; *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 85.

{¶ 104} State's exhibit 15–E, a decidedly gruesome photo, shows Jacob's body after it was removed from the mattress. This photo depicts the charring of the tissues and shows that a portion of the skull had been destroyed in the fire. State's exhibit 15–F is a close-up view of Jacob's back showing that fragments of clothing still remained on his body.

{¶ 105} State's exhibits 15–G and 15–H depict different views of clothing remnants and bodily fluids left on the mattress after Jacob's body was removed. The photos show that Jacob was wearing long pants, a white T-shirt, and a blue sweatshirt. State's exhibits 15–I, 15–J, and 15–K provide three different views of the sweatshirt, showing that it was zipped and that the sweatshirt's hood covered Jacob's face. These photographs were probative of Diar's intent as well as the lack of accident or mistake. They also showed that Diar was untruthful when she told police that Jacob was not wearing a sweatshirt on the night of his death. Moreover, these photographs were not unnecessarily repetitive because Dr. Matus testified that all of them were necessary to accurately portray "the positioning of the clothing" on Jacob's body.

{¶ 106} State's exhibits 15–M and 15–O are photographs of the parts of Jacob's face and body that were not burned in the fire. These photographs helped orient the jury with the positioning of Jacob's body because the uncharred areas of his body were not as exposed to the fire. State's exhibit 15–P is a photograph of Jacob's charred and burned face showing that his eyes had been consumed by the fire. This photo supported Dr. Matus's testimony that he was unable to examine the eyes for any petechiae to help determine whether Jacob had been smothered or drowned.

{¶ 107} State's exhibit 15–Q, another gruesome photograph, shows Jacob's obliterated skull and exposed brain tissue. State's exhibit 15–S depicts that portion of the skull that was not destroyed in the fire. Both of these photographs showed why Dr. Matus was unable to determine whether Jacob had died from a blow to the head.

{¶ 108} State's exhibit 15–T shows the inside of Jacob's mouth and supported Dr. Matus's testimony that there was no soot or other debris in his mouth or the back of his throat. State's exhibit 15–U depicts an incision along the nose showing that no soot, foam, or other debris was inside Jacob's nasal passages. Finally, State's exhibit 15–V is a photograph of Jacob's larynx and trachea showing that his airways were clear of soot and other debris. These photographs supported Dr. Matus's testimony that Jacob's death was not a result of the fire.

{¶ 109} The trial court did not abuse its discretion in admitting these photographs. The photos illustrated the coroner's testimony and demonstrated Diar's specific intent to kill. Moreover, these photos gave the jury a "total appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio

St.3d 231, 251, 586 N.E.2d 1042. Thus, the trial court could have reasonably found that the substantial probative value of each of the photographs outweighed any unfairly prejudicial impact on the jury.

{¶ 110} Nevertheless, Diar argues that the gruesome photographs should not have been admitted because they were cumulative to other crime-scene photographs that the state introduced. This argument lacks merit. The other crime-scene photographs were introduced to prove that the house fire was arson. Thus, these photographs were admitted for a purpose different from that of the photographs admitted during the coroner's testimony.

{¶ 111} Based on the foregoing, we overrule proposition VIII.

{¶ 112} *Sufficiency of the evidence.* In proposition of law VI, Diar challenges the sufficiency of the evidence to convict her of aggravated murder. Diar argues that the evidence is insufficient because the state's evidence was "cobbled together," there is no evidence of Jacob's actual cause of death, and she never admitted killing Jacob.

{¶ 113} Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 114} Diar's sufficiency claims lack merit. Although Dr. Matus was unable to determine the exact cause of death, Dr. Matus determined that Jacob had died before the fire because his mouth, nasal passages, and lungs were clear of any soot or debris. Moreover, despite the warm summer weather, Jacob was found wearing long pants, a T-shirt, and a hooded sweatshirt that was pulled down over his face. Subsequent testing showed that the hood, Jacob's underwear, and the mattress pad tested positive for the presence of an "ignitable liquid." Based on this evidence, Dr. Matus was able to conclude that Jacob's cause of death was "homicidal violence of an undetermined origin."

{¶ 115} Expert forensic testimony also supports the jury's verdict. Bethune testified that he detected the "[v]ery strong smell" of gasoline when entering the Diar home after the fire. Bethune identified burn patterns resulting from the use of gasoline as an accelerant, which led across the living room and dining room floors and into the bedroom where Jacob's body was found. He also found burn patterns that were consistent with the use of flammable liquids near the foot and the side of the bed. Bethune concluded that the fire had been started by "the

direct act of a human hand and flame device with an accelerant." Bures reached a similar conclusion.

{¶ 116} Although Diar denied killing Jacob, her explanations to investigators about what happened before and during the fire helped establish her guilt. Diar told investigators that no one other than Leroma had visited her house on the evening before the fire. Diar had had the door locks changed on the day before the fire and stated that the doors were locked when she went to bed. Diar gave Jacob a bath before he went to bed, but she insisted that nothing happened in the bathroom or elsewhere that evening that might have injured him. Diar speculated that Jacob might have started the fire with a lighter, but she said that there was no gasoline in the house that might have started and spread it. Diar also told police that Jacob was not wearing a hooded sweatshirt when he went to bed and that Jacob did not even own one.

{¶ 117} Diar's behavior during the fire also belies her claims. Upon arrival of the fire department, Diar told one of the first firemen to enter the house that Jacob was "[d]ownstairs in the back." However, as the fireman entered the house, Diar pulled on his arm and told him that Jacob was upstairs. Diar also told police that she had gone into the house on two occasions looking for Jacob. However, Diar was not covered in soot and had no trouble breathing when the paramedics arrived.

{¶ 118} Other testimony showed that Diar viewed Jacob as a burden, frequently used babysitters to care for Jacob when she went out at night, and instructed babysitters to give him codeine that was not prescribed for him. This testimony showed that Diar viewed Jacob as interfering with her style of life and that she lacked concern about his well-being. This dissatisfaction provided a motive for her to kill him. Similarly, testimony that Diar was drinking and dancing on the night of the funeral showed Diar's lack of concern about Jacob's death and reinforced the proof of motive.

{¶ 119} Diar argues that the evidence was insufficient because the state was unable to establish the exact cause of Jacob's death. The coroner was unable to provide a specific cause of death because much of Jacob's body had been destroyed in the fire. However, the coroner's determination that Jacob died as the result of "homicidal violence of an undetermined origin" was a sufficient finding to support Diar's conviction for aggravated murder. See *State v. Heinish* (1990), 50 Ohio St.3d 231, 234–235, 553 N.E.2d 1026.

{¶ 120} In addition, Diar argues that the evidence was insufficient because there were discrepancies in witness testimony. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Our review of the entire record shows that the

testimony was neither inherently unreliable nor unbelievable. See *Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 201–202. Accordingly, we reject this assertion.

{¶ 121} The coroner's testimony, expert forensic testimony, Diar's statements to investigators, and testimony from various people about Diar's behavior before, during, and after the fire support the conclusion that, after construing the evidence most strongly in favor of the prosecution, a rational trier of fact could have found Diar guilty of the aggravated-murder charges. Thus, we overrule proposition VI.

{¶ 122} *Instructions.* In proposition of law XI, Diar challenges the guilt-phase instruction on reasonable doubt. Diar argues that this faulty instruction permitted the jury to find her guilty based on a degree of proof below that required by the Due Process Clause. However, we have repeatedly affirmed the constitutionality of the reasonable-doubt standard set forth in R.C. 2901.05(D). *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604. We overrule proposition XI.

{¶ 123} In proposition of law XIII, Diar argues that the instructions shifted the burden of proof. Diar challenges the following guilt-phase instruction that the trial court gave over defense objection:

{¶ 124} "In your deliberations you may not discuss or consider the subject of punishment. Your duty is confined to *the determination of guilt or innocence.* The duty to determine any punishment is placed, by law, upon the Court." (Emphasis added.)

{¶ 125} Diar claims that this instruction asked the jury to determine whether Diar was innocent, when it should have been considering only whether the state had proved her guilty. Diar's argument that this instruction effectively shifted the burden of proof lacks merit.

{¶ 126} An instruction "must be viewed in the context of the overall charge." *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. The trial court had already instructed the jury that the state had the burden of proof as to the elements of each offense and that if the state failed to meet that burden, the jury must acquit. No reasonable juror would have believed that this incidental reference to "guilt or innocence" shifted the state's burden of proof to the accused. Moreover, we have previously rejected claims of prejudicial error arising from the use of "guilt or innocence" in such instructions. *State v. Coley* (2001), 93 Ohio St.3d 253, 268, 754 N.E.2d 1129; *Jones,* 91 Ohio St.3d at 348–349, 744 N.E.2d 1163. Proposition XIII is overruled.

{¶ 127} In proposition of law XIV, Diar argues that the trial court's instructions on "purpose" relieved the state of its burden of proof on the mens rea

element of the aggravated-murder counts. However, Diar failed to object to these instructions at trial and waived all but plain error. Crim.R. 30(A); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. No plain error occurred.

{¶ 128} The trial court provided the following instruction regarding purpose:

{¶ 129} "The person acts purposely when it is his or her specific intention to cause a certain result.

{¶ 130} "It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of another person.

{¶ 131} *"When the essence of the offense is a prohibition against conduct of a certain nature, a person act[s] purposely if his or her specific intention was to engage in conduct of that nature, regardless of what the person may have intended to accomplish by such conduct."* (Emphasis added.)

{¶ 132} In the context of the entire instructions, the jurors could not reasonably have been confused by this instructional language. The instructions emphasized that Diar must have specifically intended to cause Jacob's death to be guilty of aggravated murder. Moreover, we have previously rejected similar arguments in other murder cases. See *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 71–72; *State v. Wilson* (1996), 74 Ohio St.3d 381, 392, 659 N.E.2d 292. Proposition XIV is rejected.

{¶ 133} ***Verdict forms.*** In proposition of law XII, Diar argues that the trial court erred by giving the jury verdict forms that did not mandate a finding of guilt beyond a reasonable doubt. However, Diar did not object to the verdict forms and waived all but plain error. *State v. Williams* (1996), 74 Ohio St.3d 569, 573, 660 N.E.2d 724. In the alternative, Diar claims that her counsel were ineffective by failing to object to these verdict forms.

{¶ 134} The Ohio Revised Code does not require any particular language in a verdict form. R.C. 2945.171 merely requires that "[i]n all criminal cases the verdict of the jury shall be in writing and signed by each of the jurors concurring therein." Here, the verdict forms state that the jury found Diar guilty of each of the charged offenses and specifications, and each verdict form is signed by all 12 jurors.

{¶ 135} Because the verdict forms do not specify that the jury found Diar guilty beyond a reasonable doubt, Diar argues that the jury may have found Diar guilty on a burden less than reasonable doubt.

{¶ 136} Before giving the jury the verdict forms, the trial court instructed the jury, "The defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of the truth of every essential element

of the crimes, which are charged in the indictment." The trial court also instructed the jury on each of the charges and specifications that it must find the defendant guilty beyond a reasonable doubt before finding her guilty. Based on these instructions, there is little chance that the verdict forms misled the jury on the correct burden of proof. Thus, there was no plain error.

{¶ 137} Diar's ineffectiveness claim also lacks merit. Reversal for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. As discussed, the language on the verdict forms was not improper. Thus, Diar has failed to establish that her counsel were deficient by failing to object to them.

{¶ 138} Based on the foregoing, we reject proposition XII.

{¶ 139} ***Prosecutorial misconduct.*** In proposition of law IV, Diar argues that the prosecutor committed misconduct during the trial. However, except where noted, trial counsel failed to object and waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 140} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 141} **1. Guilt-phase opening statement.** Diar claims that the prosecutor committed misconduct by making irrelevant and inflammatory comments during his opening statement.

{¶ 142} Diar argues that the prosecutor's opening statement improperly connected her experience as a four-year-old burn victim with setting her house on fire. During opening statements, the prosecutor stated:

{¶ 143} "She also became, after the age of 4, when she was burned, she became a person who paid a great deal of attention—who went to burn camps, for example—a person who obtained and had, on August 27th, 2003, a great deal of knowledge about fires, both good and bad. Having been the victim of a fire, she knew all about fires."

{¶ 144} During a later portion of his opening statement, the prosecutor stated: "We know by way of the evidence that this fire that was set, gasoline was used as

an accelerant. Gasoline was used as an accelerant by, A, a person who is familiar with fires, and, B, has some specific knowledge about fires. Nicole Diar."

{¶ 145} During opening statements, counsel is accorded latitude and allowed "fair comment" on the facts to be presented at trial. *State v. Leqnard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. The prosecutor's assertion that Diar knew about fires and had used that information in setting her house on fire was based on testimony that Diar had been a childhood burn victim and received treatment for her burns for many years. Thus, the prosecutor's remarks represented "fair comment." Moreover, the trial court instructed the jury that the opening statements are "merely statements of counsel designed to assist you, but they are not evidence." We presume that the jury followed the instructions of the judge. Accordingly, there was no plain error.

{¶ 146} Second, Diar contends that the prosecutor's opening statement improperly evoked images of the World Trade Center attack on September 11, 2001. The prosecutor described Diar's clean appearance after exiting her burning house by stating: "Think about 9/11. Think about the World Trade Center. Think about the people you saw getting out of there, covered with dirt and debris because they had been in a fire, while Nicole Diar's body and clothes are pristine, and they didn't smell of gas, either, even though she told police, I was on the couch."

{¶ 147} The prosecutor's comparison of Diar's appearance with the victims of the World Trade Center attack made the point that Diar's clean clothing and appearance do not support her statement to the police that she had searched for Jacob inside her smoke-filled home. This isolated comment was not made to inflame the jury. Thus, no plain error occurred. Compare *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 78–79 (prosecutor's comparisons to the Silver Bridge collapse during voir dire not prejudicial).

{¶ 148} **2. Leading questions.** Diar argues that the prosecutor committed misconduct by repeatedly asking witnesses leading questions to place his theories of the case before the jury and interject his own inflammatory opinions about her.

{¶ 149} A leading question is "one that suggests to the witness the answer desired by the examiner." 1 McCormick, Evidence (5th Ed.1999) 19, Section 6. Under Evid.R. 611(C), "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony." However, the trial court has discretion to allow leading questions on direct examination. *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 138; *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 190, 616 N.E.2d 909.

{¶ 150} First, Diar contends that the prosecutor improperly used leading questions to vouch for experts who agreed with Dr. Matus's conclusions. The following exchange took place between the prosecutor and Dr. Matus:

{¶ 151} "Q: Did you also continue to consult with other coroners and other pathologists throughout the state regarding this case?

{¶ 152} "A: Yes, I did.

{¶ 153} " * * *

{¶ 154} "Q: Okay. And, based upon the literature and your consultations with those individuals, *some of which were very highly skilled in fire and fire-related deaths—*

{¶ 155} "A: Yes.

{¶ 156} "Q: —were you able to rule out a hematoma to the back of the head?

{¶ 157} "A: Yes. * * * The hematoma, we felt, was artifact, which is as a result, a naturally occurring result of the fire itself." (Emphasis added.)

{¶ 158} The prosecutor asked a leading question that improperly injected the qualifications of unnamed experts whom Dr. Matus consulted with in reaching his conclusion. However, Dr. Matus's testimony helped the defense because the state was unable to show that Jacob had died from a blow to the head, and an exact cause of death could not be established. No plain error occurred.

{¶ 159} Second, Diar argues that the prosecutor disregarded the trial court's rulings sustaining objections to leading questions. On redirect examination, the prosecutor engaged Dolence, the forensic radiographer, in the following questions and answers:

{¶ 160} "Q: There were areas of fire at the edge of the living room as it went into the dining room and went into the bedroom?

{¶ 161} "Mr. Bradley (the defense counsel): Objection.

{¶ 162} "Q: Do you recall that?

{¶ 163} "Mr. Bradley: Leading.

{¶ 164} "Q: All right.

{¶ 165} "The Court: Okay.

{¶ 166} "Q: So therefore, there were at least a fire—

{¶ 167} "The Court: Sustained.

{¶ 168} "Q: —fire matter in all three rooms; is that correct?

{¶ 169} "A. Correct."

{¶ 170} Here, the prosecutor improperly persisted in asking leading questions after the trial court had sustained defense objections to such questioning. However, there was no prejudicial error because earlier testimony had established evidence about the spread of the fire in Diar's home.

{¶ 171} Third, Diar contends that the prosecutor misbehaved by asking leading questions of Faulkner, Harkless, Abfall, and Sunshine Cantrell. Faulkner testified that she gave Jacob codeine after Diar asked her to do so. During direct examination, the prosecutor asked Faulkner, "Did you think it was wrong to give somebody medicine that didn't seem to need it?" Harkless testified that she observed Diar drinking, dancing, and singing at a bar on the evening after Jacob's funeral. The prosecutor then asked, "She didn't appear to be upset or sad; is that correct?" The prosecutor asked Faulkner and Harkless improper leading questions. In both instances, however, no plain error occurred because the questioning elicited obvious answers.

{¶ 172} Abfall testified that on the day before Jacob's funeral, Diar said, "I want the liquor. Don't forget the liquor" while traveling through the drive-through lane at the beverage store where Abfall worked. Diar complains that the prosecutor improperly asked on redirect, "She didn't say, 'For God sakes, I just lost my son?'" The trial court sustained an objection to this question. The prosecutor then repeated the question, and the trial court sustained another objection to it. Thus, there was no prejudice because defense objections were sustained. As for Cantrell, the bartender at Jack and Diane's Lounge when Diar was there, Diar complains that the prosecutor asked a series of leading questions about how she would behave if her child had been burned in a fire. Although some of the prosecutor's questions were improperly leading, there was no plain error because the testimony mostly covered irrelevant matters.

{¶ 173} Fourth, Diar complains that the prosecutor used leading questions throughout Detective Garcia's testimony. After the jury heard Garcia's audio-taped interview of Diar, the prosecutor asked Garcia:

{¶ 174} "Q: Now, during the course of this, approximately, half-hour interview, she appears to be somewhat emotional; is that correct?

{¶ 175} "A: Yes.

{¶ 176} "Q: Did you note whether or not she was sobbing, crying, tearing?

{¶ 177} "A: Well, there were sounds being made as if she was crying, and at that time I tried not to be too judgmental because I figured she was in grief at that point. So I really wasn't paying much attention to that other than hearing what I heard."

{¶ 178} The prosecutor's first question was leading. However, there was no plain error because the jury could hear that Diar was emotional while listening to her interview. The prosecutor's second question was asked in a directive but nonsuggestive manner and was not leading.

{¶ 179} After the jury viewed the videotape of Diar's second interview, the prosecutor asked Garcia a series of leading questions about the reasons investiga-

tors had asked Diar about Jacob's blow to the head. The prosecutor elicited that Diar had been asked about a blow to the head because the coroner had not ruled out a hematoma as a cause of death at the time of the interview. This series of leading questions did not result in plain error because Dr. Matus's earlier testimony had explained that he was unable to determine whether Jacob had died from a blow to the head.

{¶ 180} The prosecutor also used leading questions in asking Garcia about (1) Diar's clean appearance after exiting her house, (2) Diar's missing house keys, (3) whether gasoline from Diar's car provided a possible source of fuel to start the fire, (4) whether any evidence supported a break-in theory, and (5) whether the police checked all gas stations to determine whether Diar had purchased gasoline. These improper leading questions did not result in plain error because the questions elicited information already presented during the trial.

{¶ 181} The prosecutor also asked Garcia a series of leading questions in establishing a possible reason that Diar had moved her car across the street on the night before the fire:

{¶ 182} "Q: All right. Now, the fire was in the house, correct?

{¶ 183} "A: That is correct.

{¶ 184} "Q: And the person, Nicole Diar, who started that fire, wouldn't know how far—

{¶ 185} "Mr. Bradley (defense counsel): Objection.

{¶ 186} "Q: —the fire might—

{¶ 187} "The Court: Sustained.

{¶ 188} "Q: I'm, sorry. The person who started the fire wouldn't know, number one, how long it would take the fire department to get there; would that be a fair statement?

{¶ 189} "A: Yes.

{¶ 190} "Q: And therefore, wouldn't know how far that fire might spread; would that be a fair statement?

{¶ 191} "A: Yes.

{¶ 192} "Q: And wouldn't know that that fire might leapfrog into the garage and destroy her prize possession of the car, correct?

{¶ 193} "Mr. Bradley: Objection, leading.

{¶ 194} "The Court: Well, leading, correct.

{¶ 195} "Q: Right?

{¶ 196} "The Court: Sustained.

{¶ 197} "Q: At any rate, there's no predictability to what a fire might do until it's put out * * *, correct?

{¶ 198} "A: Yes.

{¶ 199} "Q: Could have gone into the garage, correct?

{¶ 200} "A: It could have.

{¶ 201} "Q: And if her car had been in there, her prize possession, it would have been destroyed, correct?

{¶ 202} "A: Yes.

{¶ 203} "Q: So very conveniently, she just happened to hide it someplace else the night * * * before this particular fire, correct?

{¶ 204} "A: Correct."

{¶ 205} The prosecutor's leading questions suggested that Diar moved her car across the street so that it would not be destroyed after she started the fire. The prosecutor committed misconduct by continuing to ask leading questions after the trial court had sustained objections to such questioning. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 149. However, such misconduct did not pervade the trial to such a degree that there was a denial of due process. Compare *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203. Other compelling evidence was presented at trial that established Diar's guilt, and there is no reason to believe that the outcome of the trial was affected by the prosecutor's improper questioning.

{¶ 206} Finally, Diar contends that the prosecutor misbehaved in using leading questions during Huff's testimony. During direct examination, the prosecutor asked Huff, "And you agree with me there's a difference in being a mother in buying someone a lot of toys and spending a lot of time and being emotionally attached to the child?" The trial court sustained a defense objection to this leading question. The prosecutor properly rephrased the question, and there was no further objection. Thus, no error occurred.

{¶ 207} During redirect examination, the prosecutor asked Huff leading questions regarding her thoughts about the absence of gasoline on Diar's clothing and Diar's habit of giving money to male friends. However, no plain error occurred because Huff's opinion about these matters had little relevance.

{¶ 208} The prosecutor also used the following leading question in asking for Huff's current opinion about whether Huff thought that Diar could have killed Jacob: "But that opinion changed based upon her behavior and the things you learned subsequent to that, hasn't it?" The trial court sustained a defense objection to this question, and the prosecutor rephrased the question without drawing a second objection. The prosecutor committed misconduct by asking an

improper question. However, there was no prejudicial error because Huff's opinion had no bearing on the underlying facts of the offenses.

{¶ 209} During redirect examination, the prosecutor also asked Huff an improper leading question about whether Diar maintained "a clean house * * * like a good mother would keep?" No error occurred because the trial court sustained an objection to the question, and the prosecutor rephrased the question in a nonleading manner. Further, the prosecutor asked, "And do you consider a good mother somebody that has babysitters give codeine to their children that belongs to another person?" However, the trial court sustained an objection to this question, and the question was not repeated.

{¶ 210} On redirect examination, Huff was also questioned about Diar's going out the night of Jacob's funeral because her brother had encouraged her to do so. Over defense objection, the prosecutor asked, "It wasn't—to your knowledge, was it at gunpoint or a threat if she didn't go?" The trial court sustained an objection to this leading question. The trial court then allowed the prosecutor to ask, "To your knowledge, was it her choice then to go out?" The prosecutor misbehaved by asking the sarcastically phrased question about going out at "gunpoint." However, no prejudice occurred because earlier testimony had explained Diar's reasons for going out on the night of the funeral.

{¶ 211} **3. Guilt-phase closing arguments.** Diar argues that the prosecutor committed misconduct during guilt-phase closing arguments. First, Diar claims that the prosecutor misstated the facts in arguing that Teresa Barthel, who saw Diar and Jacob in the hospital when he was brought in with stomach pains, "thought the child was basically dying." The prosecutor exaggerated Barthel's testimony because she testified that Jacob had been "crying and moaning" and was in "a lot of pain, a lot of pain." Nevertheless, the prosecutor's comments were not unduly prejudicial and did not result in plain error. Moreover, any errors were corrected by the trial court's instructions that the arguments of counsel were not evidence and that the jury was the sole judge of the facts. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 436, 588 N.E.2d 819.

{¶ 212} Second, Diar contends that the prosecutor improperly theorized about the evidence in arguing, "She most likely caused Jacob Diar's death. He was either smothered or drowned in that tub." Diar also argues that the prosecutor improperly argued that prior calculation and design were established because she had "an opportunity while she was smothering or drowning him to change her mind."

{¶ 213} Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn from the evidence. A prosecutor may state his or her opinion if it is based on the evidence presented at trial. *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 154.

{¶ 214} The prosecutor's argument that Jacob was "most likely" smothered or drowned was based on testimony that Jacob was a homicide victim and had been killed before the fire. The prosecutor's argument was a reasonable theory and represented a fair inference that could be made from the record. Moreover, the prosecutor's argument that Diar could have changed her mind before killing Jacob represented fair comment. No plain error occurred.

{¶ 215} The prosecutor's argument that Jacob might have drowned was based on Diar's admission that she gave Jacob a bath before he went to bed and testimony that investigators found water and toys in the bathtub after the fire. However, Dr. Matus did not find that Jacob might have drowned. He testified that Jacob's lungs were clear of soot and debris. Although the prosecutor did not misrepresent the evidence, it is questionable whether the prosecutor's argument represented a fair inference based on the record. Nevertheless, the jury was advised that the prosecutor's argument was not evidence, and they were the sole judge of the facts. There was no plain error.

{¶ 216} Third, Diar claims that the prosecutor misstated the evidence in arguing during rebuttal, "[D]id you see how it tore up Alicia Huff to have to testify against her best friend and to sit here and tell you, 'Yeah, I think she did it.' " The prosecutor's rebuttal responded to defense argument that "in April of 2004, when [Diar] had to turn herself in when she was indicted, that * * * [Huff] believed that this whole thing was * * * BS. But now all of sudden she comes into court here, two years later, and she says, * * * *now I believe that Nicole did this.*" (Emphasis added.)

{¶ 217} Both parties have latitude in responding to arguments of opposing counsel. *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082. The defense counsel opened the door to the prosecutor's rebuttal argument. The prosecutor's remarks represented a fair characterization of the defense counsel's description of Huff's testimony. Thus, no plain error occurred.

{¶ 218} Diar also claims that the prosecutor improperly argued on rebuttal, "Nor is the government's resources anything that are in trial. In fact, you heard testimony that Nicole Diar probably has more money than the State of Ohio did in prosecuting this case." The prosecutor's rebuttal responded to a defense argument that defense counsel's daughter "understands the concept of how scary it is to be a citizen of this country and have to face the State of Ohio and all their resources and all the investigators and all the forensic experts and everyone else, and have to somehow prove that you're not guilty." The prosecutor's rebuttal represented fair comment, and no plain error occurred.

{¶ 219} Fourth, Diar argues that the prosecutor's argument denigrated defense counsel. It is improper to denigrate defense counsel in the jury's presence. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 304.

{¶ 220} During closing argument, trial counsel mentioned the movie "A Cry in the Dark," in which a mother was found guilty of killing her child on a camping trip. Trial counsel told the jury that the mother had said that her child had been killed by a wild dog that carried her child from her tent into the bush. Three years after the mother's conviction, the victim's clothing was found in an isolated area with dog saliva on it. On rebuttal, the prosecutor argued, "Mr. Bradley (the defense counsel) watches movies, and that's exactly what they are * * *, movies, a cry for you to try to make up some imaginary possible doubt to find things his way. It's an attempt to divert your attention from the actual evidence and to move it to the theory. And we all know what makes better movies is to exaggerate things to the point of being ridiculous. That's why. That's where the twist and turns come from. But this is real life."

{¶ 221} The prosecutor could properly respond to defense arguments analogizing Diar's case to a movie. The prosecutor's argument that counsel was trying to make up some "imaginary possible doubt to find things his way" and "divert your attention from the actual evidence" was directed at pointing out the flaws in counsel's argument rather than to counsel's insincerity in presenting them. Similarly, counsel's arguments about exaggerating things were remarks directed at the evidence and not counsel. Compare *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 167 (the prosecutor improperly juxtaposed his "honest" case with the defense case and unfairly suggested that the defense's case was untruthful and not honestly presented). No plain error occurred.

{¶ 222} Finally, Diar claims that the prosecutor's rebuttal mischaracterized defense argument in stating that the defense was asking the jury to "teach the government a lesson. Let's teach the government not to point its finger at people." The prosecutor's rebuttal responded to defense argument, "We're going to try to make it fair when the government points their finger at you." It also responded to defense argument that "[w]hat [defense counsel] want is * * * the government, who's pointing the finger, to be able to prove that case and to prove it beyond all reasonable doubt." Thus, the defense opened the door to the prosecutor's argument that the defense wanted the jury to "teach the government not to point its finger at people." The prosecutor did mischaracterize the defense argument in stating that the defense wanted the jury to teach the government a lesson. However, there is no reasonable basis to conclude that the result of the trial would have been different absent these improper comments. Thus, the prosecutor's comments did not result in plain error.

{¶ 223} 4. **Cumulative error.** Diar argues that the cumulative impact of the prosecutor's misconduct prejudiced her. However, the record shows that Diar received a fair trial, and any error was nonprejudicial.

{¶ 224} Based on the foregoing, we overrule proposition IV.

{¶ 225} *Ineffective assistance of counsel.* In proposition of law VII, Diar argues that her counsel were ineffective on multiple occasions during the trial.

{¶ 226} 1. **Failure to renew motion for a change of venue.** Diar argues that her counsel were ineffective by failing to renew a pretrial motion for a change of venue after voir dire.

{¶ 227} The defense filed a pretrial motion requesting a change of venue, which was denied as premature. The state also filed a motion for a "gag order" requesting that the parties be prohibited from discussing the case, and the defense opposed this motion. The trial court denied the state's motion. Two years after the murder, the parties conducted voir dire, and a jury was selected. The defense did not renew its motion for a change of venue.

{¶ 228} Voir dire about pretrial publicity was completely adequate. Most of the seated jurors had heard something about the case. These jurors indicated that they had not formed any opinions about guilt and could fairly listen to the evidence before reaching a verdict.

{¶ 229} Counsel could have reasonably decided not to renew the motion for a change of venue after voir dire was completed. See *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 49. Moreover, a change of venue is not automatically granted when there is pretrial publicity. Any decision to change venue rests largely within the discretion of the trial judge. Id. Nevertheless, Diar claims that her counsel were deficient by opposing the state's motion for a "gag order" because that opposition undercut earlier defense arguments for a change of venue. However, this argument is speculative and lacks merit. Trial counsel were not deficient by failing to renew the motion for a change of venue.

{¶ 230} 2. **Failure to object to photographs.** Diar also argues that her counsel were ineffective by failing to object to gruesome and cumulative crime-scene photographs.

{¶ 231} Bethune used photographs taken inside the house to illustrate his testimony and conclusion that an accelerant was used to start the fire in the downstairs bedroom and then spread it to other areas in the house. Four of these photographs depicted Jacob's charred body as it was found in the bedroom. Bures also used photographs taken throughout the house in explaining her testimony and conclusion that "[t]he fire was set; it was not accidental." None of Bures's photographs showed Jacob's body.

{¶ 232} Many of the crime-scene photographs were cumulative. However, the mere fact that there are numerous photographs does not result in prejudicial error, absent gruesomeness or shock value. See *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542. Most of the photos depicted fire damage, which

does not have a shock value equivalent to the photograph of a corpse. Id. Thus, any failure to object to the crime-scene photographs that did not show Jacob's body was not prejudicial.

{¶ 233} Four photographs did show Jacob's charred body. However, these photos were less gruesome than other photographs introduced during the coroner's testimony. Counsel's failure to object to this limited number of gruesome photographs was not prejudicial.

{¶ 234} **3. Adequacy of the cross-examination of Leroma Penn.** Diar argues that her counsel were ineffective by failing to cross-examine Leroma about two money orders she had stolen from Diar before the fire. Diar claims that this information would have discredited Leroma's testimony and prevented the state from casting doubt on Diar's statements to her landlord.

{¶ 235} On October 7, 2005, during the state's case-in-chief, the defense filed a subpoena requesting copies of two money orders that had been stolen from Diar before Jacob's death. On October 11, copies of the two money orders were faxed to the defense. The two money orders appeared to show that Leroma had signed them and had cashed them in her name. On October 24, a week after the jury's verdict on findings, the defense filed a motion for a new trial alleging that the state had withheld information about the money orders. The prosecutor responded by stating that the prosecution was unaware of the money orders until the motion for new trial was filed.

{¶ 236} On October 27, the trial court conducted a hearing on the motion for new trial. Trial counsel stated that after the trial began, the state disclosed the existence of two money orders that Diar had cashed. Diar then informed counsel that she had purchased four money orders and that two of them had been stolen. The defense then issued a subpoena and received copies of the money orders before the trial ended. Defense counsel explained that the money orders were not used at trial because the defense did not receive verification that Diar had issued a stop payment on the money orders until October 26. After the hearing, the trial court denied the request for a new trial.

{¶ 237} Diar argues that her counsel were ineffective by failing to conduct a thorough pretrial investigation that would have uncovered information about the stolen money orders. It is speculative whether a more thorough pretrial investigation would have uncovered the two money orders because their relevance was not established until it was learned that Leroma had apparently cashed them. However, counsel's performance was deficient in failing to request a continuance after the defense received copies of the money orders showing Leroma's signature. A continuance would have allowed counsel to obtain information needed to recall Leroma as a witness and fully cross-examine her.

{¶ 238} Nevertheless, Diar cannot establish that the deficient performance was prejudicial. The two stolen money orders could have impeached Leroma's testimony. But evidence that Leroma stole Diar's money orders would have made no difference in the outcome of the case because their theft provides no motive for Leroma to kill Jacob and start a fire to cover up his death. Similarly, the theft of the money orders shows that Diar told Hassler the truth about the money orders, but such testimony made no difference in the outcome of the case.

{¶ 239} 4. **Other ineffectiveness claims.** Diar raises other instances of alleged ineffectiveness, but even if we assume deficient performance of counsel, Diar cannot show prejudice. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. As discussed in other propositions, Diar was not prejudiced by counsel's failure to object to prosecutorial misconduct (proposition IV) or by counsel's failure to object to the trial court's instructions (propositions XI, XIII, and XIV).

{¶ 240} Based on the foregoing, proposition VII is overruled.

### *Penalty-phase issue*

{¶ 241} *Instructions.* In proposition of law I, Diar argues that the penalty-phase instructions were flawed.

{¶ 242} Diar contends that the trial court erred by failing to instruct the jury that a solitary juror could prevent the imposition of the death penalty. During the parties' discussion on jury instructions, the defense requested an instruction that if a single juror "concludes that the aggravating circumstances do not outweigh the mitigating circumstances, beyond a reasonable doubt, then [the jury must] go down to life without parole." The trial court refused to give this requested instruction.

{¶ 243} The trial court provided the jury with instructions before penalty-phase opening statements and after the completion of the penalty-phase final arguments. During both sets of instructions, the trial court advised the jury that if it found that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt, the jury must recommend the death penalty. The trial court also instructed the jury that if the state did not prove, beyond a reasonable doubt, that the aggravating circumstance outweighed the mitigating factors, it must impose one of the life-sentence options. The trial court also instructed the jury: "When all twelve, and I repeat, all twelve jurors agree on a verdict, all of you sign, in ink, one and only one of these * * * verdict forms."

{¶ 244} Diar argues that these instructions violate *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030. In *Brooks,* this court held that it is error for a trial court to require a jury to unanimously reject a death verdict before considering one of the life sentence options. Id. at 160, 661 N.E.2d 1030. *Brooks*

reasoned that "R.C. 2929.03(D)(2) [addressing imposition of a sentence for aggravated murder] contains no limiting language as to when a jury may contemplate a life sentence." Id. Accordingly, when the jury cannot unanimously agree on death as punishment, it properly considers one of the alternative sentences. As a result, *Brooks* counseled courts to advise jurors in capital cases that "a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." Id. at 162, 661 N.E.2d 1030.

{¶ 245} A trial court's failure to provide the solitary-juror instruction has not resulted in reversal in other capital cases. See *State v. Madrigal* (2000), 87 Ohio St.3d 378, 395, 721 N.E.2d 52; *Jones*, 91 Ohio St.3d at 350–351, 744 N.E.2d 1163. Nevertheless, the state has elected to concede that the trial court's failure to provide such an instruction constitutes error, given the totality of the specific circumstances, and requires that the cause be remanded to the trial court for a new mitigation hearing.

{¶ 246} We accept the state's concession of error. Accordingly, we vacate Diar's death sentence and remand the cause for a new mitigation hearing. Proposition I is sustained.

### Moot issues

{¶ 247} Given our remand for a new mitigation hearing, we do not address the remaining issues related to the death penalty raised in propositions I, II, III, IV, VII, IX, XI, and XV.

### Conclusion

{¶ 248} We vacate Diar's sentence of death because of the trial court's failure to give a "solitary juror" instruction. We affirm Diar's convictions and remaining sentences. The cause is hereby remanded for a new mitigation hearing pursuant to R.C. 2929.06.

Judgment affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Dennis P. Will, Lorain County Prosecuting Attorney, and Anthony Cillo and Billie Jo Belcher, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, and Linda E. Prucha, T. Kenneth Lee, and Justin C. Thompson, Assistant Public Defenders, for appellant.