[Cite as *State v. Auerswald*, 2013-Ohio-742.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 11CA0053-M |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DENNIS K. AUERSWALD | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 10-CR-0318 |

DECISION AND JOURNAL ENTRY

Dated: March 4, 2013

---

MOORE, Judge.

{¶1} Defendant-Appellant, Dennis K. Auerswald, appeals from his sentence and conviction set forth in the April 14, 2011 judgment entry of the Medina County Court of Common Pleas. We affirm.

I.

{¶2} On February 10, 2009, at 4:16 a.m., Maureen Auerswald, Mr. Auerswald's wife, died at MetroHealth Medical Center of acute intoxication by ethylene glycol. Ethylene glycol is a type of alcohol commonly found in antifreeze. Mr. Auerswald was indicted on one count of aggravated murder, in violation of R.C. 2903.01(A), one count of murder, in violation of R.C. 2903.02(A), and one count of forgery, in violation of R.C. 2913.31(A)(3). Mr. Auerswald pleaded not guilty to all counts and moved the trial court to sever counts one and two, for aggravated murder and murder, from count three, for forgery. The trial court granted Mr.

Auerswald's motion and he waived his right to a jury trial on count three. Counts one and two proceeded to a jury trial.

{¶3} During its case, the State called thirty-nine witnesses, including medical providers, police officers, insurance agents, church members and family.

{¶4} Mr. Auerswald called two witnesses to testify upon his behalf.

{¶5} At the conclusion of a ten day trial, the jury found Mr. Auerswald guilty of aggravated murder, in violation of R.C. 2903.01(A), and murder, in violation of R.C. 2903.02(A). The trial court found Mr. Auerswald not guilty of forgery. The counts for aggravated murder and murder merged, and the State elected to proceed to sentencing on aggravated murder. Pursuant to R.C. 2929.03(A)(1)(d) and R.C. 2929.13(F), the trial court sentenced Mr. Auerswald to life imprisonment with parole eligibility after serving thirty full years.

{¶6} Mr. Auerswald timely appealed, and sets forth five assignments of error for our consideration. For ease of discussion, we have combined and rearranged Mr. Auerswald's assignments of error to facilitate our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT VIOLATED [MR. AUERSWALD'S] RIGHTS TO A FAIR TRIAL UNDER THE OHIO AND FEDERAL CONSTITUTIONS AND COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED THE INTRODUCTION BY THE STATE OF OTHER CRIMES, WRONGS, OR ACTS TO SHOW PROOF OF [HIS] CHARACTER IN VIOLATION OF RULES OF EVIDENCE 404(B) AND 403 AND WHEN IT PERMITTED THE STATE TO INTRODUCE A HEARSAY STATEMENT CONTAINED IN A 911 CALL[.]

{¶7} In his first assignment of error, Mr. Auerswald argues that the trial court erred in permitting the State to present other acts evidence and to introduce a hearsay statement in

violation of the Rules of Evidence and the Federal and Ohio constitutions. Specifically, Mr. Auerswald contends that the trial court should not have allowed the State to present: (1) Carol Kaale's testimony regarding incidents in 1998 and 1999, (2) Pastor David Davidson's testimony regarding a conversation with Mrs. Auerswald in 1999, (3) Josephine Dubois' testimony regarding telephone calls in 2007 and 2008, and (4) Officer Bryan Wagner's testimony regarding his response to domestic violence 911 calls in 2006 and 2008. Additionally, Mr. Auerswald contends that the 911 call of September 2006, contained impermissible hearsay statements. Finally, Mr. Auerswald contends that the following evidence served no relevant purpose: (1) Pastor Jeff Kolodziej's testimony regarding Mr. Auerswald's drinking, and (2) a series of emails, both before and after Mrs. Auerswald's death, describing marital discord and infidelity.

{¶8} In response, the State argues that the evidence was admissible to prove identity, motive, scheme, plan, and to provide a background of the offense.

{¶9} It is well settled that a trial court possesses broad discretion with respect to the admission of evidence. *State v. Ditzler*, 9th Dist. No. 00CA007604, 2001 WL 298233 *2 (Mar. 28, 2001), citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). The Supreme Court of Ohio has held that "[t]he admission of such evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 66, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Also, an "'[a]buse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.'" *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, quoting

*AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). Further, "[a] review under the abuse-of-discretion standard is a deferential review. It is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Morris* at ¶ 14, citing *AAAA Ents., Inc*. at 161.

{¶10} We first address the admissibility of the alleged "other acts" evidence. Pursuant to Evid.R. 404(B):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as *proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident*.

(Emphasis added.) Proof of one of these purposes must go to an issue which is material in proving the defendant's guilt for the crime at issue. *State v. DePina*, 21 Ohio App.3d 91, 92 (9th Dist.1984), citing *State v. Burson*, 38 Ohio St. 2d 157, 158 (1974).

Further, R.C. 2945.59 provides:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶11} In *State v. Roper*, 9th Dist. No. 22566, 2005-Ohio-6327, ¶ 9, (judgment reversed on other grounds) this Court stated that:

> [T]he standard for determining admissibility of such evidence is strict, and the statute section and rule must be construed against admissibility. However, this strict admissibility standard must be considered contemporaneously with the fact

that the trial court occupies a superior vantage in determining the admissibility of evidence.

(Internal quotations and citations omitted.) Further, in *State v. Curry*, 43 Ohio St.2d 66, 72-73 (1975), the Supreme Court of Ohio stated that "other acts" testimony which forms part of the immediate background of the charged crime may be admissible as demonstrating a scheme, plan, or system. The reason is that "[a] jury is entitled to know the 'setting' of a case, including evidence of other crimes that explains the circumstances or tends logically to prove any element of the offense charged." *State v. Thomas*, 9th Dist. No. 10CA009756, 2011-Ohio-1629, ¶ 17, citing *State v. Wilkinson*, 64 Ohio St.2d 308, 317 (1980).

{¶12} In the present matter, over defense objection, the State presented the following testimony:

1. Ms. Carol Kaale, a friend from Illinois, testified that in the summer of 1998, she observed a black-and-blue mark on Mrs. Auerswald's face at the church picnic. While she was asking Mrs. Auerswald if she was ok, Mr. Auerswald approached and the conversation ended. Ms. Kaale explained that Mrs. Auerswald "became very quiet, looked down, and would not meet [her] eye contact anymore." In addition, Ms. Kaale testified that at a potluck dinner, "[Mrs. Auerswald] came over and grabbed [her] arm and she was shaking, her whole body was shaking," and then, Mrs. Auerswald stated, "I can't be with him right now. Don't let him over here close to me."

2. Pastor David Davidson, of Faith Temple, testified that in December of 1999, he and his wife went to the Auerswald residence because Mrs. Auerswald seemed anxious and expressed that she "was concerned of [Mr. Auerswald] possibly doing her harm[.]"

3. Ms. Josephine Ann Dubois, Mrs. Auerswald's Aunt, testified that in March of 2007, during a telephone conversation with Mrs. Auerswald, she "heard a loud crash as though

it was a door hitting something." She then heard Mr. Auerswald's voice saying, "[w]hat the f do you think you're doing?" and, "[g]et off the f-ing phone, bitch." At that time, Ms. Dubois testified that she instructed Mrs. Auerswald to "[g]et out of the house," "get out of the house now." Additionally, Ms. Dubois testified that during another telephone conversation in December of 2008, Mrs. Auerswald expressed fear of Mr. Auerswald and stated that she could not leave the Auerswald residence because of her cats and her financial situation. Further, when Ms. Dubois instructed Mrs. Auerswald to, "[g]et out. He's going to do you harm," Mrs. Auerswald replied, "[t]hat is of a thought," which is a British phrase meaning "a distinct possibility."

4. Officer Bryan Wagner, of the City of Medina Police Department, testified that in March of 2008, he responded to a 911 call at the Auerswald residence. Upon arriving, he observed that Mrs. Auerswald was very scared, shaking, crying and had some injuries including scratches on her wrists, and she also complained that her right knee was "bothering her." Officer Wagner described the situation, stating:

* * *

Q. And when you arrived there, when you described her as scared, shaking, upset, crying did she tell you what had happened—

A. She did.

Q. –soon after—immediately upon your arrival?

A. Correct.

Q. Sir, what did she tell you?

* * *

A. She had told me that she got into an argument with her husband at one point, the argument became heated, he was pushing her. He pushed her to the ground where he then pinned her by her wrists. She was able to scratch his face while they were kind of tussling around on the ground, which made him get off.

\* \* \*

Further, Officer Wagner testified that in September of 2006, he also responded to a 911 call at the Auerswald residence and observed that both parties had been drinking. However, he stated that he would not describe Mrs. Auerswald as "being drunk," and, as a result of the call, the police "transported Mr. Auerswald to a hotel for the evening."

{¶13} We look to the Supreme Court of Ohio's discussion of other-acts evidence in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, for guidance with the present matter. On the morning of August 27, 2003, a fire seriously damaged Ms. Diar's home and her four-year old son, Jacob, was found dead in a first floor bedroom. *Id*. at ¶ 1. A fire inspector opined "that an accelerant had been used to spread the fire from the dining room into the bedroom where Jacob's body was found." *Id*. at ¶ 28. Further, the burn patterns in the bedroom were consistent with "a flammable liquid having been poured around the bed." *Id*. at ¶ 29. Through an autopsy, it was determined that Jacob died prior to the fire beginning because "[h]is mouth and nasal passages were clear of any soot, foam, or debris, and his larynx, trachea, and lungs were clear of soot and debris." *Id*. at ¶ 36. However, due to the near total destruction of his skull, the coroner could not determine if Jacob died from a head injury. *Id*. Ms. Diar was charged with, among other things, the aggravated murder of Jacob. *Id*. at ¶ 62.

{¶14} The State theorized that Ms. Diar "killed Jacob because she no longer wanted a child, and taking care of Jacob was interfering with her style of life." *Id*. at ¶ 68. In support of this theory, the State introduced testimony regarding Ms. Diar's (1) lack of parenting, poor housekeeping, and money problems, (2) frequent use of babysitters, (3) instructing babysitters to give Jacob codeine, and (4) dancing, drinking, and singing at a bar the evening after Jacob's funeral. In upholding the trial court's decision to allow this evidence, the Supreme Court of

Ohio reasoned that "[t]estimony that [Ms.] Diar left Jacob unattended, fed him fast food, and acted like Jacob was a bother provided the context for the alleged crimes and made [Ms.] Diar's action more understandable to the jurors." *Id*. at ¶ 72. In addition, the Court concluded that testimony regarding Ms. Diar's frequent use of babysitters, failing to leave emergency contact numbers, staying out late at night, and lack of grief and exuberant behavior on the day of Jacob's funeral was relevant to prove motive under Evid.R. 404(B). *Id* at ¶ 79. At the conclusion of her jury trial, Ms. Diar was convicted of aggravated murder and sentenced to death. *Id*. at ¶ 1-2.

{¶15} Here, similar to *Diar*, the State theorized that Mr. Auerswald killed his wife due to financial difficulties and because she impinged upon the bachelor lifestyle he desired. The State's introduction of evidence regarding Mrs. Auerswald's ongoing fear of her husband, instances of domestic violence, and observations of physical injury due to abuse provide a context for the jury to better understand the parties' relationship and Mr. Auerswald's *motive* for committing these crimes. Further, in its charge to the jury, the trial court issued a limiting instruction regarding this evidence, stating:

> Now, evidence was received about the commission of other wrongs or acts by [Mr. Auerswald] other than the offense[s] with which [he] is charged in this trial. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of [Mr. Auerswald] in order to show that he acted in conformity with that character. If you find that the evidence of other wrongs or acts is true and that [Mr. Auerswald] committed them, you may consider that evidence only for the purpose of deciding whether it proves [Mr. Auerswald's] motive, intent, or purpose, preparation, or plan to commit the offense[s] charged in this trial, or knowledge of circumstances surrounding the offense[s] charged in this trial.

> That evidence cannot be considered for any other purpose.

{¶16} We presume that the jury followed the trial court's instructions. *State v. Veal*, 9th Dist. No. 26005, 2012-Ohio-3555, ¶ 28. Given that the trial court specifically instructed the jury that they were not to consider this evidence as proof of Mr. Auerswald's character, or for *any*

purpose other than deciding whether it proved motive, intent, purpose, preparation, or plan to commit the charged offenses, we must presume that the jurors did as they were instructed. *Id.* As such, the above-stated testimony of Ms. Kaale, Pastor Davidson, Ms. Dubois, and Officer Wagner is admissible under Evid.R. 404(B) to prove Mr. Auerswald's motive to commit aggravated murder and murder. Therefore, based upon the record before us, we cannot conclude that the trial court abused its discretion in admitting this evidence.

{¶17} Notwithstanding the foregoing discussion, we recognize Mr. Auerswald's argument that Ms. Kaale's testimony regarding incidents and conversations that took place in 1998 and 1999, as well as Pastor Davidson's testimony regarding a conversation with Mrs. Auerswald in 1999, could be considered too remote in time to be admissible as evidence of background or motive in this matter. Further, we acknowledge that the type of physical violence exhibited by Mr. Auerswald against Mrs. Auerswald as depicted in that testimony was different in nature from the poisoning, and, as such, may not be entirely relevant to show background, motive, plan or scheme. *See State v. Williams*, Slip Opinion No. 2011-2094, 2012-Ohio-5695, ¶ 19-20.

{¶18} For the sake of argument, even if Ms. Kaale's and Pastor Davidson's testimony should not have been admitted, we do not believe this error, if any, was prejudicial to Mr. Auerswald. The jury heard an overwhelming amount of admissible evidence regarding the parties' toxic relationship, Mrs. Auerswald's ongoing fear of her husband, the parties' financial problems, Mr. Auerswald's extramarital interests, and the series of events on February 9, 2009, and February 10, 2009, which ultimately led to Mrs. Auerswald's death. Therefore, any claimed error based on the admission of this testimony would be harmless beyond a reasonable doubt. *See State v. Morris*, 9th Dist. No. 09CA0022-M, 2012-Ohio-6151, ¶ 50.

{¶19} Next, we address Mr. Auerswald's argument that the 911 call of September 2006, contained impermissible hearsay statements that should have been redacted prior to playing the recording in the presence of the jury. Specifically, Mr. Auerswald argues that Mrs. Auerswald's statements regarding ongoing abuse during their 11 year marriage and an incident of domestic violence that occurred two days prior to the 911 call do not fall within the hearsay exceptions described in Evid.R. 803(1), (2), or (3). We disagree.

{¶20} Pursuant to Evid.R. 801(C), hearsay is an out of court statement offered to prove the truth of the matter asserted, and is generally inadmissible at trial. However, Evid.R. 803 provides exceptions to this general rule, including an exception for an excited utterance. Evid.R. 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In *State v. Wallace*, 37 Ohio St.3d 87, 89 (1988), the Supreme Court of Ohio set forth four conditions for satisfying the excited utterance exception to the hearsay rule:

(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

(Emphasis sic.) *See also State v. Hoehn*, 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, ¶ 11; *Akron v. Hutton*, 9th Dist. No. 22425, 2005-Ohio-3300, ¶ 6.

{¶21} Here, we conclude that the four *Wallace* conditions have been satisfied because: (1) the statements and declarations occurred while Mrs. Auerswald was experiencing a startling event which caused her to lock Mr. Auerswald out of the house for fear that he would injure her, lock herself in a guest bedroom for added security, and call 911 for assistance, (2) the statements and declarations regarding ongoing abuse and Mrs. Auerswald's physical injuries from two days prior were made during this incident before Mrs. Auerswald's nervous excitement dissipated, (3) the statements and declarations all related to the circumstances of the present incident of domestic violence, and (4) Mrs. Auerswald personally observed all matters asserted in her statements and declarations.

{¶22} Further, we find no merit in Mr. Auerswald's argument that this is not an excited utterance because Mrs. Auerswald sounded "calm" during the 911 call. First, under *Wallace*, there is no requirement that a person act or sound a certain way in order for her statement to be considered an excited utterance. Second, during the 911 call, Mrs. Auerswald told the operator that Mr. Auerswald was pounding on the door trying to get inside the house. She also stated that Mr. Auerswald was out of control, inebriated, and had thrown their possessions all over the driveway. Further, Mrs. Auerswald told the operator that she hoped Mr. Auerswald had no way of getting back inside the house, and that, if he did, he could break the lock to the guest bedroom. Finally, when Mrs. Auerswald realized that Mr. Auerswald *had* gotten back inside the house, she stated "please, please get someone here quickly. I know that he will injure me." As such, even if Mrs. Auerswald seemed calm at times during her conversation with the 911 operator, her words indicate that she was clearly frightened and distressed by the situation.

{¶23} Therefore, because Mrs. Auerswald's 2006 911 call is an excited utterance under Evid.R. 803(2), the trial court did not abuse its discretion in allowing the jury to hear the entire recording.

{¶24} Finally, we address Mr. Auerswald's argument that the following evidence served no relevant purpose: (1) Pastor Jeffrey Kolodziej's testimony regarding Mr. Auerswald's drinking, and (2) a series of emails, both before and after Mrs. Auerswald's death, describing marital discord and infidelity.

{¶25} First, we address the relevance, if any, of Pastor Kolodziej's testimony. Pastor Kolodziej, of Cornerstone Church, testified that Mr. Auerswald was removed as an altar minister at the church because "[t]here were complaints from people that felt as though he smelled like alcohol while he was praying for them." We conclude that, pursuant to Evid.R. 402, Pastor Kolodziejs' testimony was not relevant and should not have been admitted into evidence. However, based upon the other evidence in this case, Pastor Kolodziej's testimony was insignificant and did not materially prejudice Mr. Auerswald. *See Diar* at ¶ 79.

{¶26} Next, we address the relevance, if any, of: (1) two emails sent in December of 2006 by Mrs. Auerswald to Ms. Dubois regarding the former's contemplation of divorce due to marital discord, (2) an email exchanged between Mr. Auerswald's former colleagues, Kristin Jensen and Karen Petz, regarding a conversation where Mr. Auerswald stated, among other things, that "[a]fter his wife died, he went on line to meet someone and now has a lady that really loves him," and (3) emails exchanged in July of 2008, between Mr. Auerswald and "Margarita" where Mr. Auerswald writes:

> You sound very nice and I'd like to communicate with you. Where do you live? Please send the pictures you said that you have. I own my [own] business and fly my own plane. I live in Ohio and can take very good care of you. What do you

think? You have the advantage as I do not know if you've seen my profile or my picture. So, your turn. Warm regards, Dennis.

{¶27} As previously discussed, the State theorized that one of Mr. Auerswald's motives for killing Mrs. Auerswald was to be free of the marriage, to be single again, and to date other women. We conclude that the above emails show marital discord, as well as Mr. Auerswald's desire to date other women both before and after Mrs. Auerswald's death. As such, pursuant to Evid.R. 403, these emails are relevant to prove motive and are not unduly prejudicial to Mr. Auerswald. Therefore, the trial court did not abuse its discretion in allowing these emails into evidence.

{¶28} Mr. Auerswald's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT VIOLATED [MR. AUERSWALD'S] RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND HIS RIGHTS UNDER THE OHIO CONSTITUTION TO A FAIR TRIAL BY REFUSING TO ALLOW THE DEFENSE TO INTRODUCE EVIDENCE FAVORABLE TO [HIM][.]

{¶29} In his second assignment of error, Mr. Auerswald argues that the trial court erred in not allowing Mr. Jim Kiraly, Mr. Auerswald's former employer, to testify that, on February 9, 2009, at 9 a.m., he overheard Mr. Auerswald state, "[s]top drinking that stuff and call the doctor," during a telephone conversation. Mr. Auerswald contends that this statement should not have been excluded as hearsay because it is not an assertion. Mr. Auerswald also contends that, if this statement is hearsay, it is admissible as an excited utterance.

{¶30} As stated above, a trial court possesses broad discretion with respect to the admission of evidence. *Ditzler* at *2. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore* at 219. Further, "[d]ue process requires only 'that criminal defendants be afforded a

meaningful opportunity to present a complete defense.'" *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 46, quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). As such, "'[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *Hale* at ¶ 46, quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

**{¶31}** Here, in excluding Mr. Kiraly's testimony as hearsay, the trial court reasoned:

> You're not using it to prove he was on the phone or using it to prove that he could speak on the phone or using it to prove that the phone was on or using it to show that he was physically present. It is the fact that he said "[s]top taking that stuff and call the doctor." I mean, that's—I can't see any other reason, other than for the truth of the matter, that he's explaining that it would be pertinent. I don't understand any other reason for it.

Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, Mr. Auerswald's statement "[s]top drinking that stuff and call the doctor," is not hearsay because it is not an assertion. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 97. "An assertion for hearsay purposes 'means to say that something is so, e.g., that an event happened or that a condition existed.'" *State v. West*, 10th Dist. No. 06AP-114, 2006-Ohio-5095, ¶ 9, quoting *Leonard* at ¶ 97, quoting *State v. Carter*, 72 Ohio St.3d 545, 549 (1995). Mr. Auerswald's statement, "[s]top drinking that stuff and call the doctor" is not an assertion, but rather a directive. It cannot be proven true or false. Because this statement cannot be offered to prove the truth of the matter asserted, the trial court incorrectly excluded this testimony as hearsay.

**{¶32}** However, even though the trial court erred in excluding this testimony as hearsay, Mr. Auerswald was not materially prejudiced by its exclusion. Mr. Auerswald's stated purpose for admission of the statement was to demonstrate to the jury that he was concerned about his

wife's health and urged her to consult a doctor. This, he argues, is inconsistent with a desire to kill her. However, the jury heard a portion of Mr. Auerswald's police interview where he admitted to speaking with Mrs. Auerswald on February 9, 2009, at 9 a.m. Additionally, the jury heard Detective Thomas testify that Mr. Auerswald spoke with Mrs. Auerswald on February 9, 2009, at 9 a.m., and that she was still fighting the stomach flu and taking Pepto-Bismol. The jury also heard Mr. Kiraly testify that he heard Mr. Auerswald on the office telephone the morning of February 9, 2009. Finally, the jury heard multiple witnesses testify that Mr. Auerswald took his wife to the emergency room when he found her unconscious on the evening of February 9, 2009. This testimony arguably contradicts the State's theory that Mr. Auerswald murdered his wife, which is the very same reason Mr. Auerswald sought to introduce the statement "[s]top drinking that stuff and call the doctor." The jury, as trier of fact, could have chosen to believe that it was counter-intuitive for Mr. Auerswald to take his wife to the emergency room if he intended to proverbially "get away with murder." It stands to reason that evidence of Mr. Auerswald actually taking Mrs. Auerswald to the emergency room would be more persuasive to the jury than evidence of a co-worker overhearing a one-sided conversation between Mr. Auerswald and an unknown third-party. However, in spite of knowing that Mr. Auerswald took her to the emergency room, the jury still convicted him of aggravated murder and murder. Had the proferred testimony been admitted, it would not have changed the result of the trial.

{¶33} Therefore, based upon the record before us, we conclude that the trial court erred in excluding the statement, but it did not commit reversible error because Mr. Auerswald was not materially prejudiced by its exclusion.

{¶34} Mr. Auerswald's second assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ALLOWED THE STATE TO INTRODUCE THE TESTIMONY OF A PSYCHOLOGIST WHO WAS NOT COMPETENT AS AN EXPERT AND WHO OFFERED IMPROPER OPINION TESTIMONY ON WHETHER THE ALLEGED VICTIM WAS "SUICIDAL[.]"

**ASSIGNMENT OF ERROR V**

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ALLOWED THE DEPUTY CORONER TO TESTIFY IN RESPONSE TO A HYPOTHETICAL QUESTION BASED ON INADMISSIBLE HEARSAY THAT THE MANNER OF DEATH WAS HOMICIDE[.]

**{¶35}** In his third and fifth assignments of error, Mr. Auerswald argues that the trial court committed plain error by allowing the State to introduce testimony from: (1) Ross Santamaria, Ph.D., as to whether Mrs. Auerswald was suicidal, and (2) Joseph Felo, M.D., as to Mrs. Auerswald's manner of death. Specifically, Mr. Auerswald contends that Dr. Santamaria was not qualified as an expert on the issue of suicide, and that Dr. Felo used inadmissible hearsay to respond to a question regarding Mrs. Auerswald's manner of death. During trial, Mr. Auerswald's counsel did not object to this testimony.

**{¶36}** Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Further, "[a] plain error must be obvious on the record, such that it should have been apparent to the trial court without objection." *State v. Kobelka*, 9th Dist. No. 01CA007808, 2001 WL 1379440, *2 (Nov. 7, 2001). Because notice of plain error is to be taken with utmost caution and only to prevent a manifest miscarriage of justice, the decision of a trial court will not be reversed due to plain error unless the defendant has established that the outcome of the trial clearly would have been different but for the alleged error. *Kobelka* at *2, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), and *State v. Phillips*, 74 Ohio St.3d 72, 83 (1995).

**{¶37}** Pursuant to Evid.R. 702(B), a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Further, "[n]either special education nor certification is necessary to confer expert status on a witness." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 54. As such, "[t]he witness offered as an expert need not have a complete knowledge of the field in question, as long as the knowledge he or she has will aid the trier of fact." *Id.* citing *State v. Baston*, 85 Ohio St.3d 418, 423 (1999).

**{¶38}** Here, Dr. Santamaria testified that: (1) he is a clinical psychologist with a B.A. from Oberlin in chemistry and biology, an M.A. from Case Western Reserve in counseling and psychology, and a Ph.D. from Case Western Reserve in psychology, (2) he has been practicing in this field for approximately 39 years, (3) he is licensed with a specialty in forensic psychology, (4) he ran the First Offenders Program in Medina County, (5) he has expressed his opinion as an expert with regard to issues such as the competency of an accused to stand trial and the "not guilty by reason of insanity" status of an accused, (6) he serves as a hostage negotiator for the Cleveland Police Department, and (7) in his clinical practice, he treats individuals with disorders such as schizophrenia, paranoia, severe depression, bipolar disorder, mood swings, and suicidal ideations. In light of Dr. Santamaria's educational background and almost 40 years of training and experience as a clinical psychologist, we conclude that the trial court did not commit any obvious errors in allowing him to offer expert testimony on the issue of suicide. Therefore, no plain error has occurred.

**{¶39}** Additionally, Dr. Felo, forensic pathologist and deputy coroner for Cuyahoga County, opined regarding Mrs. Auerswald's manner of death as follows:

\* \* \*

Q: As you sit here today, based upon your education, training, and experience, the autopsy, the toxicology, and your review of those necessary medical records,

do you have an opinion, within a reasonable degree of scientific certainty in forensic pathology, as to the cause of death of [Mrs.] Auerswald?

A. Yes, I do.

Q. And what is that?

A. [Mrs.] Auerswald died as a result of acute intoxication by ethylene glycol.

Q. Okay. Your manner of death was listed, you said, in June of 2009, correct?

A. Yes.

Q. All right. And your manner of death, again, was listed as what?

A. Violence of undetermined origin.

Q. Since that time, has law enforcement, and specifically the Medina Police Department, provided you any additional information about [Mrs.] Auerswald—

A. Yes—

Q. – and her life circumstances?

A. –they have.

Q. Have you been provided additional information about what she was doing on the day in question?

A. Yes.

Q. Did you learn about contact she had on the telephone and the nature of her discussions as they were portrayed to you by the Medina Police?

A. Yes.

Q. Were you given additional information about the history of her marriage as it pertains to domestic violence and/or other marital problems?

A. Yes.

Q. Doctor, based upon all the information, that additional information you were given, based upon your education, your training, your experience, the autopsy, the toxicology, your review of the medical records, and that additional information you received after June 2009, can you tell us, as you sit here today, what your opinion is within a reasonable degree of scientific certainty in the field of forensic pathology as to the manner of death of [Mrs.] Auerswald, as you sit here today?

A. I can. My opinion is that this is a homicide.

\* \* \*

**{¶40}** Mr. Auerswald contends that the admission of the above testimony constitutes plain error because Dr. Felo's opinion is based, in part, upon inadmissible hearsay. Evid.R. 703 states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." As such, "[e]xpert opinions 'may be based on perceptions *or* facts or data admitted in evidence.'" (Emphasis sic.) *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, ¶ 77, quoting *State v. Solomon*, 59 Ohio St.3d 124, 126 (1991). In *Solomon* at 126, the Supreme Court of Ohio concluded that the testimony of two experts was admissible where they personally examined the victim, and also reviewed reports not in evidence, thus satisfying Evid.R. 703 by basing their opinion, in whole or in major part, on facts or data perceived by them.

**{¶41}** Here, similar to *Solomon*, Dr. Felo provided direct supervision over the individual performing Mrs. Auerswald's autopsy, and, in doing so, was physically present in the examination room during her autopsy. Dr. Felo also supervised the completion of the autopsy report. Thus, Dr. Felo based his opinion, at least in part, on facts or data that he directly perceived during the autopsy. Based upon the foregoing, we see no obvious error in the admission of Dr. Felo's testimony regarding Mrs. Auerswald's manner of death, even if it was based, in part, on Medina police reports not in evidence. Therefore, no plain error occurred.

**{¶42}** Mr. Auerswald's third and fifth assignments of error are overruled.

## ASSIGNMENT OF ERROR IV

[MR. AUERSWALD'S] CONVICTIONS FOR MURDER AND AGGRAVATED MURDER ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶43} In his fourth assignment of error, Mr. Auerswald argues that there is insufficient evidence to sustain his convictions for aggravated murder and murder. In support of this argument, Mr. Auerswald contends that: (1) there is no evidence as to the manner of Mrs. Auerswald's death, (2) there is no direct evidence as to how Mrs. Auerswald ingested ethylene glycol, and (3) if he was really interested in money, he would have immediately made a claim on the $100,000 life-insurance policy.

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. *See also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Id.*

{¶44} Here, a jury found Mr. Auerswald guilty of aggravated murder, in violation of R.C. 2903.01(A), and murder, in violation of R.C. 2903.02(A). R.C. 2903.01(A) states, in relevant part, that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" Further, R.C. 2903.02(A) states, in relevant part, that "[n]o person shall purposely cause the death of another[.]"

{¶45} As proof that Mr. Auerswald purposely caused Mrs. Auerswald's death with prior calculation and design, the State presented the following evidence:

1. Erva Perz, a friend from Cornerstone Church, testified that on February 8, 2009, she and her husband Tom called the Auerswald residence and spoke with Mrs. Auerswald on speaker phone for over an hour. Ms. Perz described the conversation as "fun" and said "we just laughed and giggled a lot that afternoon." When asked if she ever thought Mrs.

Auerswald was suicidal, Ms. Perz responded "[a]bsolutely not. Maureen loved life. She was wonderful with our church. * * * [A]nd another thing Maureen loved was her animals. She loved those cats so much. She would never leave them." Ms. Perz further testified that, during the conversation, Mrs. Auerswald said "[o]h, Dennis is here now and he'll pray with you," and then someone slammed the receiver down and the call ended.

2. When Mrs. Auerswald called back later that day, Ms. Perz testified that she sounded "apologetic" and that she prayed a "beautiful prayer" for Ms. Perz's husband Tom. Ms. Perz also testified that Mrs. Auerswald was in a great mood and that the second called ended pleasantly.

3. A few hours later, Mr. Auerswald called the Perz's, again on speaker phone, and just before the conversation ended said "[o]h, Maureen went up to bed now." "You need to pray for her, because she seems—she said she's very hurt, very upset, *and she said she's going to take some antifreeze*." (Emphasis added.) Ms. Perz testified that Mrs. Auerswald never mentioned anything to her about drinking antifreeze.

4. On the evening of February 9, 2009, at approximately 6:15 p.m., Mr. Auerswald allegedly found his wife lying unconscious on the floor with a gash on the right side of her head. He did not call an ambulance or 911. Instead, he answered a telephone call from the Perz's and told them that he "just got home and [] found Maureen on the floor with some vodka by her." Then, he ended the telephone call in order to check his wife's vital signs. Mr. Auerswald then called the Perz's back and asked them to come from Brunswick, which is 20 minutes away, to assist with getting her to the hospital.

5. Mr. Perz testified that he questioned Mr. Auerswald as to why he did not want to call 911, and Mr. Auerswald indicated that it was due to his financial situation.

6. Mrs. Auerswald arrived at Medina General Hospital at approximately 7:41 p.m., about an hour and a half after Mr. Auerswald allegedly found her unconscious.

7. Rosa Kovach, a unit assistant in the emergency room at Medina General Hospital, testified that she asked Mr. Auerswald what happened and he responded that "he came home from work at 6 o'clock and found her like that, and she had been drinking all day." When Ms. Kovach asked why he did not call 911, he told her that "he went to his friend's house in Brunswick first and then he came here." Ms. Kovach testified that she did not smell any alcohol on Mrs. Auerswald. Further, Ms. Kovach testified that Mr. Auerswald was very calm, did not seem concerned, and did not mention anything about the possibility of Mrs. Auerswald drinking antifreeze.

8. Dr. Levine, the emergency room physician at Medina General Hospital, testified that Mr. Auerswald said his wife had been drinking and he found her unresponsive on the floor. In addition, Dr. Levine testified that Mr. Auerswald did not mention to him anything about ethylene glycol or antifreeze.

9. Ms. Perz testified that, while at Medina General Hospital, she saw Mr. Auerswald dispose of the bottle of Pepto-Bismol that he had taken from his house and that Mrs. Auerswald had been drinking from earlier that day.

10. At approximately 9 p.m., Mrs. Auerswald was airlifted to MetroHealth Medical Center for additional testing and lab work. At approximately 10 p.m., she was moved from the emergency room to the medical intensive care unit.

11. Dr. O'Shea, a physician in the medical intensive care unit at MetroHealth Medical Center, testified that upon receiving the results of Mrs. Auerswald's lab work, he thought

she may have ethylene glycol poisoning. In order to be more certain, Dr. O'Shea asked Mr. Auerswald if there was anything else Mrs. Auerswald could have taken.

12. At approximately 1 a.m., Mr. Auerswald indicated, for the first time, that Mrs. Auerswald may have ingested antifreeze.

13. Dr. O'Shea testified that he recommended hemodialysis in order to attempt to filter the toxins out of Mrs. Auerswald's blood, however, Mr. Auerswald refused any further intervention.

14. Mrs. Auerswald died of acute intoxication by ethylene glycol on February 10, 2009, at approximately 4:16 a.m.

15. Detective Scott Thomas, of the City of Medina Police Department, testified that he investigated the Auerswald residence on the morning of February 10, 2009, prior to Mr. Auerswald returning home from the hospital. During his investigation, he found no obvious signs of suicide, such as a note, antifreeze inside the house, a cup or glass containing antifreeze, instructions regarding who would care for Mrs. Auerswald's seven cats, or any suspicious messages on the answering machine. Detective Thomas did, however, locate a gallon of antifreeze on the garage floor in front of Mr. Auerswald's black Toyota Solara. He testified that the antifreeze was capped and there were no spills on the garage floor.

16. Further, although Mrs. Auerswald had a head injury that needed five staples, Detective Thomas testified that there were no signs of blood anywhere in the house, including: the wood floor where she allegedly had fallen, Mr. Auerswald's clothing, or any other clothing found in the house.

17. Jared McArthur, an employee at House of Hunan, testified that in January of 2011, he delivered food to Mr. Auerswald who told him: (a) he's been accused of murdering his wife, (b) he needs to be cautious right now and watch his back, and (c) he "fucked up" and has been in jail for six months.

18. Dr. Felo, the Cuyahoga County Coroner, testified that he believes Mrs. Auerswald's manner of death to be a homicide.

{¶46} Additionally, the State introduced the following evidence: testimony that Mrs. Auerswald was not suicidal, testimony that on the afternoon of February 9, 2009, Mrs. Auerswald indicated: (a) she did not know why she was feeling so sick, (b) she had been trying to take her blood pressure medication, but could not keep it down, and (c) she attempted to fix her hair and do some laundry, evidence that, on the day before her death, Mrs. Auerswald was searching for employment with Brecksville Maids, testimony of marital discord and ongoing abuse by Mr. Auerswald, testimony regarding financial problems during the marriage, testimony regarding multiple life insurance policies and Mr. Auerswald's attempts to collect on certain policies just days after his wife's death, testimony of marital infidelity by Mr. Auerswald, testimony regarding several inconsistencies in Mr. Auerswald's statements regarding his wife's death, and testimony that the antifreeze found in the Auerswald residence was manufactured prior to 1994 and did not contain a bittering agent which was later added as a precaution to prevent people and animals from drinking it, thus making this particular antifreeze almost undetectable to humans.

{¶47} It is well settled that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Jenks*, 61 Ohio St.3d at 272. Moreover, in its charge to the

jury, the trial court explained that "[c]ircumstantial evidence and direct evidence are of equal weight. No one is better than the other."

{¶48} In viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found that Mr. Auerswald purposely, and with prior calculation and design, caused the death of his wife, in violation of R.C. 2903.01(A) and R.C. 2903.02(A).

{¶49} Further, Mr. Auerswald argues that his convictions are against the manifest weight of the evidence. In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten*, 33 Ohio App.3d at 340.

{¶50} Here, although Mr. Auerswald sets forth a general manifest weight challenge, he fails to make *any* specific arguments regarding how the jury clearly lost its way in convicting him of aggravated murder and murder. It is well settled that Mr. Auerswald, as the appellant, has

the burden on appeal. *See* App.R. 16(A)(7); Loc.R. 7(B)(7). "It is not the function of this [C]ourt to construct a foundation for [Mr. Auerswald's] claims; failure to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." *Kremer v. Cox*, 114 Ohio App.3d 41, 60 (9th Dist.1996). Because Mr. Auerswald has not developed an argument to support his manifest weight challenge, we decline to conduct a manifest weight analysis. *See State v. Wilson*, 9th Dist. No. 25100, 2011-Ohio-4072, ¶ 21. However, having reviewed the entire record, we conclude that the verdict finding Mr. Auerswald guilty of aggravated murder and murder is not against the manifest weight of the evidence.

{¶51} Mr. Auerswald's fourth assignment of error is overruled.

III.

{¶52} Having overruled Mr. Auerswald's five assignments of error, the judgment of the trial court is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT


WHITMORE, P.J.
CONCURS.

BELFANCE, J.
CONCURRING.

{¶53}  I concur in most of the majority's opinion and analysis.  However, with respect to the resolution of Mr. Auerswald's first assignment of error, I concur in the majority's judgment only.  A few of the other acts that were admitted as evidence occurred many years ago and are unrelated in character to the charged offenses.  Thus, I do not agree that those acts would be admissible either to establish motive or as evidence of the immediate background of the charged crimes.  Nonetheless, I would conclude that their admission constituted harmless error in light of the other evidence presented at trial.  Thus, I agree that Mr. Auerswald's first assignment of error is properly overruled.


APPEARANCES:

DAVID C. SHELDON, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW KERN, Assistant Prosecuting Attorney, for Appellee.